(No. 66488.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant and Cross-Appellee, v. DURLYN EDDMONDS, Appellee and Cross-Appellant.

*Opinion filed June 20, 1991.—Rehearing denied September 30, 1991.*

508

CLARK, J., dissenting.

Neil F. Hartigan and Roland Burris, Attorneys General, of Springfield, and. Richard M. Daley and Jack O'Malley, State's Attorneys, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Inge Fryklund, Richard. T. Sikes, Jr., Jerry D. Bischoff and Renee Goldfarb, Assistant State's Attorneys, and Marie Quinlivan Czech, Special Assistant State's Attorney, of counsel), for the People.

Randolph N. Stone, Public Defender, of Chicago (Richard E. Cunningham, of counsel), for appellee and cross-appellant.

JUSTICE BILANDIC delivered the opinion of the court:

The defendant, Durlyn Eddmonds, was convicted of murder and deviate sexual assault following a bench trial in the circuit court of Cook County. At the death penalty hearing requested by the State, the court, sitting without a jury, determined that one or more .of the aggravating factors set forth in section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)) was present and that there were no mitigating factors sufficient to preclude a sentence of death. The court sen-

tenced the defendant to death for the murder conviction and to 40 to 80 years' imprisonment for the deviate sexual assault conviction. The defendant appealed directly to this court, arguing, *inter alia*, that the trial court should have held a hearing to determine his fitness to stand trial and that his counsel was ineffective at the sentencing hearing. This court affirmed the defendant's conviction and sentence. (*People v. Eddmonds* (1984), 101 Ill. 2d 44.) The United States Supreme Court subsequently denied the defendant's petition for writ of *certiorari. Eddmonds v. Illinois* (1984), 469 U.S. 894, 83 L. Ed. 2d 207, 105 S. Ct. 271.

The defendant then filed a petition for post-conviction relief pursuant to the Post-Conviction Hearing Act (Ill. Rev. Stat. 1983, ch. 38, par. 122—1 *et seq.*), alleging that he was deprived of his right to the effective assistance of counsel because his trial counsel (1) failed to investigate his fitness to stand trial and failed to request a fitness hearing before trial and (2) failed to investigate and present mitigating evidence at his sentencing hearing. The State moved to dismiss the petition, arguing that the fitness issue had been decided on direct appeal and that defendant's counsel was not ineffective at the sentencing hearing. The trial court denied the State's motion to dismiss and ordered an evidentiary hearing. After hearing evidence and considering arguments of the parties, the trial court denied post-conviction relief. The defendant then filed a motion to vacate the order denying post-conviction relief. The trial court granted the petitioner's motion, vacated the defendant's death sentence, and ordered a hearing to determine whether the petitioner was fit to be sentenced at the time the death penalty hearing was held. The State appealed directly to this court pursuant to Supreme Court Rule 651 (134 Ill. 2d R. 651), and the defendant cross-appealed.

The Post-Conviction Hearing Act provides a remedy to criminal defendants who claim that substantial violations of their constitutional rights occurred in their trial. (*People v. Silagy* (1987), 116 Ill. 2d 357, 365.) A post-conviction proceeding is not an appeal *per se*, but a collateral attack upon a final judgment. (*People v. Albanese* (1988), 125 Ill. 2d 100, 104.) The purpose of a post-conviction proceeding is not to determine guilt or innocence, but to inquire into constitutional issues which have not been, and could not have been, previously adjudicated. (*People v. Gaines* (1984), 105 Ill. 2d 79, 87.) In a post-conviction proceeding, the petitioner bears the burden of proving that a substantial constitutional violation occurred at trial. *People v. Griffin* (1985), 109 Ill. 2d 293, 303.

As stated, the defendant raised two constitutional claims in his post-conviction petition. First, he argued that his conviction should be reversed because his counsel was ineffective in failing to investigate the defendant's competency to stand trial and failing to request a hearing to determine his competency. Second, the defendant claimed that his death sentence must be reversed because his counsel was ineffective in failing to investigate and present certain mitigating evidence at the capital sentencing proceeding. The trial court determined that the defendant was entitled to post-conviction relief on the first claim but denied him any relief on the second claim.

I

We first consider whether the trial court erred in holding that the defendant was entitled to post-conviction relief because his trial counsel was ineffective in failing to investigate the defendant's competency to stand trial. In *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the Supreme

Court formulated a two-part test for evaluating whether or not a defendant has been given the effective assistance of counsel. This test has been adopted and applied by this court. (*People v. Albanese* (1984), 104 Ill. 2d 504, 526.) Under *Strickland,* a defendant must first demonstrate that counsel's performance was deficient, in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Strickland,* 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) In addition to proving incompetence, a defendant must demonstrate that counsel's deficient performance substantially prejudiced his defense. To demonstrate prejudice, a defendant must show a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

The defendant contends that his trial counsel's performance at trial was deficient in that he failed to discover evidence relating to the defendant's fitness to stand trial. Specifically, the defendant claims that his counsel was incompetent in failing to discover that the defendant took psychotropic medication for six months while awaiting trial, but did not take medication at the time of trial. The defendant also claims that his counsel was incompetent in neglecting to discover that the defendant was diagnosed as schizophrenic in 1973. He also notes that his counsel never requested a fitness hearing because he mistakenly believed that a hearing had already been held. The defendant claims that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the sixth amendment.

Both prongs of the *Strickland* test must be satisfied before a defendant can prevail on a claim of ineffective assistance of counsel. As the Supreme Court noted in

*Strickland,* however, a court need not consider whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. (*Strickland,* 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.) If the ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer sufficient prejudice, the court need not decide whether counsel's errors were serious enough to constitute less than reasonably effective assistance. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 201; *People v. Gaines* (1984), 105 Ill. 2d 79, 92-93.) We find here that we need not consider the petitioner's claim that his trial counsel failed to investigate the fitness question. We will assume, for the sake of argument, that the petitioner's trial counsel was deficient in failing to discover the additional evidence which the petitioner now raises. The only question we need consider is whether the defendant was prejudiced by his counsel's alleged deficiencies within the meaning of *Strickland.*

The petitioner claims that he suffered prejudice because the trial court would have ordered a hearing to determine whether he was fit to stand trial, had it been appraised of the additional evidence raised in the post-conviction petition. A defendant is entitled to a pretrial hearing to determine whether he is fit only when a *bona fide* doubt of the defendant's fitness to stand trial or be sentenced is raised. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—2—1.) A defendant is presumed to be fit to stand trial. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—2—1(a).) A defendant is considered unfit to stand trial if, because of a mental or physical condition, he is unable to understand the nature and purpose of proceedings against him or to assist in his defense. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—2—1(a).) Thus, to establish that he was prejudiced by his trial counsel's alleged incompetency, the petitioner must demonstrate that facts existed

at the time of his trial which raised a *bona fide* doubt of his ability to understand the nature and purpose of the proceedings and to assist in his defense. The petitioner is entitled to post-conviction relief on his ineffective-assistance claim only if he shows that the trial court would have found a *bona fide* doubt of his fitness and ordered a fitness hearing if it had been informed of the evidence raised in his post-conviction petition.

The trial court considered the evidence introduced at the post-conviction proceeding and determined that it did not raise a *bona fide* doubt of the defendant's fitness for trial. Our analysis of the trial court's ruling on this question is complicated by the fact that the court granted the defendant's petition for post-conviction relief, even though it specifically refused to find that there was a *bona fide* doubt of petitioner's fitness for trial. When counsel for the defendant pointed out that the fitness statute called for a hearing only when there is a *bona fide* doubt of the defendant's fitness, the court responded: "I haven't made that finding." The court stated that, instead of finding "the existence of a bona fide doubt," its order would state that "the existence of some doubt regarding defendant's fitness required a fitness hearing" for its resolution. The court made the correction in the order.

The State, in its appeal, argues that the trial court erred in ordering post-conviction relief, given the court's express refusal to find that there was a *bona fide* doubt of the defendant's fitness for trial. We agree with the State that the defendant is entitled to post-conviction relief on his ineffective-assistance claim only if the evidence introduced at the post-conviction proceeding raised a *bona fide* doubt of his fitness to stand trial. The trial court's finding of "some" doubt is not a proper ground for ordering a fitness hearing. Thus, the question we must consider in this appeal is whether the trial

court correctly determined that the evidence introduced at the post-conviction hearing did not raise a *bona fide* doubt of the defendant's fitness to stand trial. If the evidence did not raise a *bona fide* doubt of the defendant's fitness, the defendant was not entitled to post-conviction relief, even if his trial counsel was incompetent in failing to discover that evidence. If, on the other hand, the trial court erred in holding that the evidence did not raise a *bona fide* doubt of the defendant's fitness, the defendant is entitled to post-conviction relief. In reviewing the trial court's determination that no *bona fide* doubt of fitness was raised, we bear in mind that the burden was on the defendant to prove that he suffered a substantial deprivation of constitutional rights (*People v. Griffin* (1985), 109 Ill. 2d 293, 303), and that determinations by the trial court will not be disturbed unless contrary to the manifest weight of the evidence (*People v. Flores* (1989), 128 Ill. 2d 66, 103).

The evidence introduced at the post-conviction proceeding relating to the fitness question must be considered in light of the facts known to the trial court at the time of the defendant's trial. On direct appeal, this court reviewed these facts and concluded that they did not raise a *bona fide* doubt of the defendant's fitness to stand trial. Briefly summarized, those facts showed that the defendant was charged on November 3, 1977, with the murder and deviate sexual assault of nine-year-old Richard Miller. Shortly thereafter, the trial court, pursuant to defense counsel's request, ordered a psychiatric examination. On December 6, 1977, Dr. Reifman of the Psychiatric Institute for the Circuit Court of Cook County reported that the defendant was unfit to stand trial. Following this report, the public defender requested a fitness hearing. The court ordered that a fitness hearing be held on January 12, 1978, and transferred the defendant to the Illinois State Psychiatric

Institute for evaluation. On the date set for the fitness hearing, defense counsel submitted a report from Dr. Goldsmith of the State Department of Mental Health stating that the defendant was fit to stand trial. Defense counsel noted the opposite conclusions reached by the psychiatrists, and petitioned the court for another mental examination by a private psychiatrist. Another examination was ordered, and on January 25, 1978, Dr. Stipes, a private psychiatrist, reported that the defendant was unfit for trial. The public defender again petitioned for a fitness hearing, and the court scheduled a hearing for March 8, 1978. On that date and on two subsequent dates the hearing was continued by agreement.

On May 25, 1978, the public defender advised the court that Dr. Reifman, the author of the first psychiatric report which stated that the defendant was unfit, wanted to re-examine the defendant prior to testifying at the fitness hearing. The trial court ordered another examination and continued the fitness hearing. On June 6, 1978, Dr. Reifman re-examined the defendant and concluded that he was "fit to stand trial with medication." The public defender then asked the court to order a psychiatric examination to determine the defendant's sanity at the time of the offense.

On March 13, 1979, the public defender expressed some confusion as to whether the defendant had been declared unfit to stand trial. On April 4, 1979, the public defender offered to simplify matters by requesting that the defendant be re-examined to determine his fitness to stand trial and his sanity at the time of the offense. The defendant was examined by Dr. Kaplan, who reported on April 10, 1979, that the defendant was fit to stand trial with no mention of any need for medication.

In May 1979, the defendant, acting *pro se*, prepared and filed a motion asking the court to appoint a private attorney to represent him, instead of an attorney from

the public defender's office. The trial court granted the defendant's motion and appointed Thomas McGinnis to represent the defendant. The newly appointed counsel promptly moved for a psychiatric examination to determine the defendant's sanity at the time of the offense. On October 1, 1979, Dr. Kaplan reported that the defendant was sane at the time of the offense. In March 1980, the case was transferred to another trial judge. The defendant was tried in June 1980.

On direct appeal, the defendant argued that the circuit court found that there was a *bona fide* doubt of his fitness because it twice ordered a fitness hearing. He further argued that once a *bona fide* doubt existed, it could only be resolved in a fitness hearing. This court disagreed, holding that the trial court did not err in failing, *sua sponte*, to hold a hearing to determine the defendant's fitness to stand trial. This court relied upon three factors in finding that there was no *bona fide* doubt of the defendant's fitness to stand trial. First, the court noted that the most recent psychiatric reports available at the time of the defendant's June 1980 trial tended to show that the defendant was fit for trial. Specifically, Dr. Reifman reported in June of 1978 that the defendant was fit with medication and Dr. Kaplan reported in April of 1979 that the defendant was fit to stand trial. Second, the court noted that the defendant's counsel did not make another request for a fitness hearing. Finally, the court noted that the defendant testified lucidly both at the hearing on the motion to suppress and at trial. The court found that the only evidence that the defendant was unfit were reports by one doctor (Dr. Reifman) who subsequently changed his opinion, and of another doctor (Dr. Stipes) whose report of unfitness was made more than two years before trial. Reviewing the record before it on direct appeal, this court deter-

mined that the trial court did not err in failing, *sua sponte*, to order another fitness hearing.

Although this court, on direct appeal, rejected the defendant's claim that there was a *bona fide* doubt of his fitness to stand trial, the defendant raises substantially the same claim in his post-conviction petition. The defendant has simply repackaged his old argument as a constitutional challenge to his counsel's competency. Thus, the evidence presented in the post-conviction proceedings to prove that a *bona fide* doubt of fitness existed must be considered in light of the evidence which this court, on direct appeal, found insufficient to raise a *bona fide* doubt of fitness.

As stated, the petitioner claims that additional evidence, which was not considered on direct appeal, raises a *bona fide* doubt as to his competency to stand trial. Specifically, the petitioner claims that a *bona fide* doubt would have arisen had the trial court been aware (1) that his counsel had serious doubts about his mental health, but did not inform the court of these doubts because counsel mistakenly believed that the defendant had previously been adjudged fit; (2) that the defendant had been diagnosed as schizophrenic in 1973; (3) that the defendant was not receiving medication at the time of trial, even though Dr. Reifman determined that he was fit to stand trial "with medication"; and (4) that the defendant's former counsel believed that the defendant was unfit.

The critical inquiry here is whether the facts presented in the defendant's post-conviction petition, in combination with the facts discussed on direct appeal, raised a *bona fide* doubt of the defendant's fitness to stand trial. The trial court held that they did not. We must consider whether the trial court's decision was contrary to the manifest weight of the evidence.

The petitioner bore the burden of proving that, at the time of trial, there were facts in existence which raised a real, substantial and legitimate doubt as to his mental capacity to meaningfully participate in his defense and cooperate with counsel. The test is an objective one. (See *United States ex rel. Rivers v. Franzen* (7th Cir. 1982), 692 F.2d 491, 497.) Relevant factors which a trial court may consider in assessing whether a *bona fide* doubt of fitness exists include a defendant's "irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." (*Drope v. Missouri* (1975), 420 U.S. 162, 180, 43 L. Ed. 2d 103, 118, 95 S. Ct. 896, 908.) The representations of defendant's counsel concerning the competence of his client, while not conclusive, are another important factor to consider. (*Drope v. Missouri*, 420 U.S. at 177 n.13, 43 L. Ed. 2d at 116 n.13, 95 S. Ct. at 906 n.13.) It is undisputed, however, that there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Drope v. Missouri*, 420 U.S. at 180, 43 L. Ed. 2d at 118, 95 S. Ct. at 908.

The petitioner claims that the evidence which most persuasively showed that there was a *bona fide* doubt of his fitness was offered by his trial attorney, Thomas McGinnis. At the evidentiary hearing on the post-conviction petition, McGinnis testified that it was his impression that the defendant's mental condition was not normal and that the defendant had a problem. When asked if this caused him to question the defendant's fitness to stand trial, McGinnis responded "Yes." When asked to explain why he questioned the defendant's fitness, McGinnis stated: "It's difficult to explain the way he reacted. *** It's difficult to put into words as to the way he reacted to my questions, not even so much in what he

said, but the way he physically reacted. Just my general impression."

McGinnis also stated that he never moved for a fitness hearing or discussed the issue with the trial judge because he thought the defendant had already been adjudicated fit. He stated he thought that "some notations on the half sheet and/or some paperwork" he reviewed indicated a fitness hearing had been held. McGinnis testified that, if he had known that a fitness hearing had never been held, he would have requested one and would have told the trial judge of his doubts regarding the defendant's fitness. McGinnis' affidavit, which was attached to the post-conviction petition, stated:

"When I was appointed to the case, I believed that a fitness hearing had already been held and that Mr. Eddmonds had been adjudicated fit for trial. I personally had serious doubts as to Mr. Eddmonds' fitness but I believed that the prior adjudication resolved those doubts. I have no recollection of ever discussing the question of Eddmonds' fitness with Judge Crowley."

The petitioner argues that McGinnis' testimony alone is sufficient to raise a *bona fide* doubt of his fitness. This court has recognized, however, that an assertion by counsel that a defendant is unfit does not, of itself, raise a *bona fide* doubt of competency. (*People v. Slaughter* (1970), 46 Ill. 2d 114, 119.) Here, McGinnis testified that he thought the defendant had a mental problem. The mere fact that the petitioner suffers from mental disturbances or requires psychiatric treatment, however, does not necessarily raise a *bona fide* doubt of his ability to consult with counsel. A defendant may be competent to participate at trial even though his mind is otherwise unsound. (See *People v. Owens* (1990), 139 Ill. 2d 351, 362; *People v. Murphy* (1978), 72 Ill. 2d 421, 431; *People v. Balfour* (1986), 148 Ill. App. 3d 215, 226.) Fitness speaks only to a person's ability to function within the context

of a trial; it does not refer to competence in other areas. *People v. Balfour* (1986), 148 Ill. App. 3d 215, 226.

We do not agree with the defendant's claim that McGinnis' testimony was sufficient to raise a *bona fide* doubt of the defendant's competency to stand trial. McGinnis' testimony on direct examination cannot be considered in isolation. McGinnis testified on cross-examination that he believed that the defendant, at the time of trial, understood the nature of the proceedings and was able to assist in his defense. He testified that the defendant understood that McGinnis was his attorney, that the defendant discussed the charges in the indictment with McGinnis, and that the defendant understood the charges against him. He also testified that the defendant understood the benefit of a jury trial as opposed to a bench trial, and that he and the defendant together made the decision to proceed with a bench trial. McGinnis testified that the defendant explained what happened after his arrest, and based on what the defendant told him, McGinnis filed motions to quash the defendant's arrest and to suppress statements the defendant made to the police.

McGinnis' testimony that the defendant understood the charges against him and was able to assist in his defense was amply supported by evidence in the record. Even before McGinnis was appointed to represent him, the defendant prepared and filed a *pro se* motion to substitute counsel, which the trial court allowed. At the hearing on his motion to suppress, the defendant gave coherent and detailed testimony regarding his activities prior to his arrest and events which occurred while he was in police custody. He claimed that his confession was the product of police coercion. Following the suppression hearing, the trial court read the six-count information to the defendant and asked him if he understood all the charges. When the defendant responded "[n]ot really,"

the trial court explained the charges in vernacular. Subsequently, the defendant stated that he knew what murder and anal intercourse were, and that he understood the charges against him.

At trial, the defendant denied that he murdered the victim and claimed that a former friend of his, Jerome Williams, admitted to the defendant that he had choked and drowned the victim. The defendant explained that his fingerprints were found on the bag containing the victim's clothing because Williams had left the bag at the defendant's apartment and the defendant returned it to him when he learned of the victim's death. The defendant also claimed that Williams attempted to kill the defendant by giving him an overdose of heroin. The defendant testified that he suspected that Williams was attempting to kill him, so he switched hypodermic needles, and Williams used the needle with the overdose in it and died. On cross-examination, the defendant carefully evaded questions which were potentially harmful to him and reaffirmed his testimony on direct examination. In view of the overwhelming evidence in the record that the defendant understood the charges against him and assisted in his defense, McGinnis' testimony that he had "some doubts" about the defendant's fitness did not automatically raise a *bona fide* doubt of the defendant's competency to stand trial. As this court has noted, "[i]f the defendant does understand the nature and object of the charges against him and can, in co-operation with his counsel, conduct his defense in a rational and reasonable manner, then he is mentally competent to stand trial although upon other subjects his mind may be unsound." *Withers v. People* (1961), 23 Ill. 2d 131, 135.

The petitioner also claims that medical evidence, which was available at the time of trial but was not presented to the trial court, raises a *bona fide* doubt of his fitness to stand trial. As support for this claim, the peti-

tioner introduced records from the Department of Corrections (Department) which showed that he was diagnosed in 1973 as paranoid and in an "early schizophrenic process" by Dr. Ciatteo, a psychiatrist with the Department. The petitioner also introduced medical records to show that he was not receiving medication at the time of trial. He points out that Dr. Reifman's June 6, 1978, report, which this court relied upon on direct appeal, stated that the defendant was fit for trial "with medication." The plaintiff also introduced Dr. Reifman's affidavit and testimony that his report finding the defendant fit for trial with medication was not reliable once the defendant was taken off medication, and that he could not give an opinion on whether the defendant was fit for trial without re-examining him. The petitioner claims that the trial court erred in refusing to find that this medical evidence established a *bona fide* doubt of his fitness to stand trial. We disagree.

The fact that a Department psychiatrist diagnosed the defendant as schizophrenic in 1973 was not particularly relevant to the question of the defendant's mental state in 1980, when he was tried. The defendant cannot claim that his mental state remained stagnant between 1973 and 1980, since the psychiatrist that made the 1973 diagnosis reported in 1975 that the defendant had no formal mental illness. Similarly, the evidence that the defendant was not receiving medication at the time of trial did not necessarily raise a *bona fide* doubt of the defendant's fitness. The medical records demonstrate that the petitioner took the medication Thorazine for six months beginning in January 1978. Dr. Reifman examined the petitioner in June 1978, while he was taking this medication, and determined that he was fit with medication. It is undisputed, however, that at least three psychiatrists reported that the defendant was fit for trial when the defendant was not on medication. On January

10, 1978, Dr. Goldsmith of the State Department of Mental Health evaluated the defendant and determined that he was fit for trial and "not in need of mental treatment at this time." More importantly, Dr. Kaplan examined the defendant in April 1979, almost a year after the defendant was taken off Thorazine, and found that he was fit for trial without any mention of medication. Dr. Kaplan's associate, Dr. Rabin, also examined the defendant in April 1979, and found that he was "minimally fit to stand trial." The fact that Dr. Reifman's report of fitness was not reliable once the defendant was taken off medication is not particularly significant, given the fact that two psychiatrists subsequently determined that the defendant was fit for trial without medication. Thus, we must conclude that the trial court did not err in finding that no *bona fide* doubt of the defendant's fitness existed, even though he was not taking medication at the time of his trial.

The petitioner also claims that he was entitled to a fitness hearing under section 104—21 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 104—21). That section states that a defendant who is receiving psychotropic medication is entitled to a hearing on the issue of his fitness while under medication. We note, however, that the petitioner received medication between January and June of 1978. Section 104—21 did not become effective until December 28, 1979, more than a year after the petitioner stopped receiving medication. The petitioner was not entitled to a fitness hearing under section 104—21, since he was not receiving medication when that statute became effective. See also *People v. Tilson* (1982), 108 Ill. App. 3d 973 (trial court did not abuse its discretion in failing to hold a fitness hearing under section 104—21, where the trial court did not know the defendant was taking medication and defendant's demeanor at trial indicated that he under-

stood the charges against him and was able to assist in his defense).

The petitioner finally claims that the testimony of his former counsel, Todd Musburger, was sufficient to raise a *bona fide* doubt of his fitness to stand trial. Musburger testified at the post-conviction proceeding that he was appointed to represent the defendant following the defendant's arrest. Musburger testified that, when he interviewed the defendant several days after his arrest, he found the defendant to be extremely disturbed. Musburger therefore requested a psychiatric examination of the defendant. Dr. Reifman subsequently reported that the defendant was unfit and another psychiatric evaluation was ordered. Musburger recalled that the case was continued a number of times and that he asked a private psychiatrist to interview the defendant. He testified that he represented the defendant for a year and a half and that he believed that the defendant was unfit for trial during the period Musburger was assigned to the case. The defendant claims that Musburger's testimony proves that there was a *bona fide* doubt of his competency to stand trial.

This court rejected a similar claim in *People v. Slaughter* (1970), 46 Ill. 2d 114, 119. In *Slaughter*, the defendant filed a post-conviction petition four years after he was convicted of murder. At the post-conviction hearing, the defendant introduced evidence that he was committed to a mental hospital seven years before trial, where he was adjudged a schizophrenic and in need of mental treatment. He was discharged and considered restored approximately four years before trial. The defendant's trial counsel testified that he did not know that the defendant was committed to a mental institution and that he had difficulty communicating with the petitioner both before and during trial. Counsel also testified that, had he known of the prior adjudication of schizophrenia,

his actions and advice during trial would have been different. He also testified that the defendant understood what he was charged with but not why he was charged. This court rejected the defendant's claim that post-conviction relief was appropriate, noting that the statement of trial counsel that the defendant could not cooperate did not, in itself, create a *bona fide* doubt of fitness. (*People v. Slaughter*, 46 Ill. 2d at 119.) The court concluded that, despite trial counsel's testimony, there were no facts in the record which indicated the petitioner's incompetence to stand trial. *People v. Slaughter*, 46 Ill. 2d at 119.

Here, Musburger's testimony did not even implicate the defendant's competency at the time of trial, since Musburger withdrew more than a year before the defendant was tried. Furthermore, Musburger's belief that the defendant was unfit throughout the period that Musburger represented him was contradicted by several psychiatric reports finding the defendant fit. Finally, the record demonstrates that Musburger himself abandoned the fitness issue once Dr. Kaplan determined that the defendant was fit to stand trial. Thus, we do not believe that the trial court erred in not relying upon Musburger's testimony that the defendant was incompetent.

We find that the trial court did not err in concluding that the evidence introduced at the post-conviction proceeding did not raise a *bona fide* doubt of the defendant's fitness to stand trial. Although we have considered each piece of evidence individually, we do not believe that any different result would follow from considering its cumulative impact. Because the trial court correctly determined that the evidence introduced at the post-conviction proceeding did not raise a *bona fide* doubt of the defendant's fitness to stand trial, the defendant was not entitled to post-conviction relief. Thus, we affirm the trial court's conclusion that no *bona fide* doubt of fitness

existed, but reverse its order granting the defendant's petition for post-conviction relief.

## II

The defendant next argues that he was deprived of the effective assistance of counsel at his sentencing hearing. He claims that his trial counsel was ineffective for (1) failing to present evidence at the second stage of the sentencing hearing that the defendant was under an extreme mental or emotional disturbance at the time of the offense, a statutory mitigating factor; and (2) failing to interview any of his family members.

To prove that his counsel was ineffective in failing to investigate and present evidence of his diminished mental state at the time of the offense, the defendant first introduced, at the post-conviction hearing, the affidavit of Dr. Reifman, the sole defense witness at the sentencing hearing. Dr. Reifman attested, in his affidavit, that he was unable to render an opinion at the sentencing hearing as to whether the defendant was acting under an emotional disturbance at the time of the offense, because defendant's counsel did not ask him to re-examine the defendant prior to sentencing. At the post-conviction hearing, the defendant introduced the testimony of two psychiatrists, Dr. Stipes and Dr. Conroe, both of whom had examined the defendant in anticipation of the hearing. Both psychiatrists expressed an opinion that the defendant was acting under the influence of extreme mental and emotional disturbance at the time of the offense. The defendant also introduced several psychiatric reports which, he alleged, indicated that he suffered from a long-standing mental illness.

The defendant also introduced the affidavit and testimony of his trial attorney, Thomas McGinnis. In his affidavit, McGinnis attested that he did not recall what preparation he made for the sentencing hearing or why

he called Dr. Reifman to testify at the hearing. McGinnis stated that he did not interview any members of the defendant's family and believed that he was given the wrong address for family members and was unable to locate them. McGinnis stated that he did not consider calling Dr. Stipes at the sentencing hearing because Stipes, in his last report, expressed his opinion that the defendant was sane at the time of the offense.

At the post-conviction hearing, McGinnis testified that he was familiar with the statutory mitigating factor of extreme mental or emotional distress at the time of the sentencing hearing. He also testified that he was aware of the difference between that statutory mitigating factor and the insanity defense. He identified letters he sent to Dr. Stipes and Dr. Kaplan before trial and their responses opining that the defendant was sane at the time of the offense. McGinnis also testified about his experience as an attorney. He testified that he was admitted to practice in Illinois in 1970 and served as an assistant State's Attorney from 1970 to 1978. During this period, he prosecuted four or five murder cases. There was no death penalty in effect at the time of those prosecutions. When he was appointed to represent the defendant in 1979, McGinnis was engaged in private practice.

The State, in response, called Dr. Reifman to testify at the post-conviction hearing. Dr. Reifman testified that he re-examined the defendant in 1985, in anticipation of the post-conviction proceeding, and formed an opinion that the defendant was not suffering from extreme mental or emotional disturbance at the time of the offense. After considering the evidence, the trial court denied the petitioner's request for post-conviction relief.

We initially note that the defendant raised this same claim on direct appeal, where he alleged that he was denied the effective assistance of counsel at sentencing be-

cause his counsel failed to present either lay or expert testimony that he had diminished mental capacity at the time of the offense. This court rejected the defendant's claim on the ground that there was no evidence available at the time of sentencing that would have tended to show this mitigating factor. The court stated that it was unlikely that defendant's trial counsel could have found expert testimony to prove the presence of diminished mental capacity at the time of the offense. The court also found no basis for concluding that the result of the proceeding would have been different had such evidence been introduced. *People v. Eddmonds* (1984), 101 Ill. 2d 44.

Because the defendant raised the ineffective-assistance claim on direct appeal, we must first consider whether he is barred from raising the same claim in this post-conviction proceeding. As a general rule, determinations of the reviewing court on direct appeal are *res judicata* as to issues actually decided, and issues that could have been raised on direct appeal, but were not, are deemed waived. (*People v. Albanese* (1988), 125 Ill. 2d 100, 105; *People v. Silagy* (1987), 116 Ill. 2d 357, 365.) These rules are relaxed, however, where the facts relating to the issue of incompetency do not appear on the face of the record. (*People v. Owens* (1988), 129 Ill. 2d 303, 308; *People v. Gaines* (1984), 105 Ill. 2d 79, 91; *People v. Thomas* (1967), 38 Ill. 2d 321, 324-25.) The trial record here does not include the evidence which the defendant now presents to substantiate the claim that his trial counsel was ineffective at sentencing. In view of the severity of the sentence imposed and because the record does not contain the evidence which the defendant now raises, we will consider the merits of the defendant's claims.

The defendant argues that the trial court erred in concluding that he was not deprived of the effective as-

sistance of counsel at sentencing. As stated, a trial court's determination in a post-conviction proceeding will not be reversed unless contrary to the manifest weight of the evidence. (*People v. Flores* (1989), 128 Ill. 2d 66, 103.) The defendant was required to satisfy the two-prong *Strickland* test, which governs ineffective-assistance-of-counsel claims. Thus, the defendant was required to show that his counsel was incompetent in failing to investigate and present additional mitigating evidence at the sentencing hearing and that he suffered actual prejudice as a result of his attorney's deficient performance. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) In reviewing the trial court's conclusion that the defendant failed to meet this test, we are guided by the Supreme Court's admonition on the subject:

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.

The defendant here first challenges his counsel's failure to present expert testimony that he was acting under an extreme mental disturbance at the time of the offense. In evaluating this claim, we must presume that counsel's actions were motivated by sound trial strategy. The defendant claims that counsel's testimony at the post-conviction proceeding rebutted this presumption and

proved that counsel's actions were the result of a failure to investigate. We disagree.

Counsel stated at the post-conviction hearing that he knew that extreme emotional distress at the time of the offense was a statutory mitigating factor and that the mental state needed to establish that mitigating factor was different from that necessary to establish the insanity defense. He also explained that he did not ask Dr. Stipes to examine the defendant to determine whether he was acting under an extreme mental disturbance at the time of the offense because Stipes had already determined that the defendant was sane at the time of the offense. Although counsel could not recall why he did not ask Dr. Reifman to re-examine the defendant before the sentencing hearing, we may presume that his decision was motivated by the same concern. In view of the facts known to counsel at the time of the sentencing hearing, we cannot conclude that counsel acted unreasonably in failing to have the defendant re-examined to determine whether he was acting under extreme emotional distress at the time of the offense.

At the time of the sentencing hearing, counsel had reports from two psychiatrists which indicated that the defendant was not insane at the time of the offense. Counsel may have rationally believed that further psychiatric examination would also show that the defendant was not acting under extreme emotional distress at the time of the offense. The only way for counsel to obtain positive proof as to whether or not that statutory mitigating factor existed was to petition the court for another psychiatric examination of the defendant. If he petitioned for such an examination, however, the psychiatrist's conclusions would have been disclosed to the trial court, the defense and the State. If the psychiatrist expressed the opinion that the defendant was not acting under extreme emotional distress at the time of

the offense, counsel would have been effectively precluded from arguing at the sentencing hearing that the defendant's history of mental illness was a mitigating factor, since the State would have used the expert's report to prove that the statutory mitigating factor of extreme emotional distress was not present.

Instead, counsel made a strategic decision to call Dr. Reifman to testify generally about the defendant's history of mental illness. Reifman informed the sentencing judge that the defendant had been diagnosed as schizophrenic, and that this mental condition had caused the defendant, at one time, to be out of contact with reality and incompetent to stand trial. By pursuing this strategy, counsel was able to raise an inference that the defendant was under extreme emotional distress at the time of the crime. It is true that counsel's strategy allowed the State to argue in rebuttal that Dr. Reifman's testimony did not prove that the statutory mitigating factor was present. Defendant's trial counsel may have rationally believed, however, that his client would be harmed less by the State's criticism of Reifman's testimony than by positive proof, in the form of a psychiatric report, that the defendant was not acting under extreme emotional distress at the time of the crime.

Although the defendant now claims that his counsel's strategy was unreasonable, we are not persuaded that counsel's acts or omissions were outside the wide range of professionally competent assistance. Dr. Reifman testified at the post-conviction proceeding that the defendant was not under extreme emotional distress at the time of the offense. This testimony demonstrates that counsel's strategic decision not to have Reifman re-examine the defendant prior to the sentencing hearing was not unreasonable. Dr. Reifman's generalized testimony at the sentencing hearing that the defendant was schizophrenic was at least minimally beneficial to the defend-

ant. Reifman's expert testimony that the defendant was not acting under extreme emotional distress at the time of the crime, on the other hand, would have seriously diminished any chance the defendant had of avoiding a death sentence.

The fact that two other experts subsequently determined that the defendant was under extreme emotional distress at the time of the offense does not make counsel's strategy at the sentencing hearing unreasonable or incompetent. Counsel's investigatory decisions must be assessed in light of the information known at the time the decisions were made. The Supreme Court has decided that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.

Here, we may presume that counsel's decision not to have any further psychiatric examinations of the defendant was supported by his reasonable professional judgment that such examinations might produce information damaging to the defendant. In view of the facts known to counsel at the time of the sentencing hearing, and applying "a heavy measure of deference to counsel's judgments" (*Strickland*, 466 U.S. at 691, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066), we must conclude that counsel's decision to forgo further investigation of the defendant's mental state at the time of the offense was not incompetent. At the sentencing hearing, counsel presented Dr. Reifman's testimony that the defendant was schizophrenic and that this mental condition caused the defendant, at one time, to be out of contact with reality, unfit for trial and in need of mental treatment. In addition to introducing evidence of the defendant's mental disturbances, counsel persuasively argued that other mitigating circumstances were present which called for a

sentence other than death. For example, counsel argued that the defendant should not be sentenced to death because he did not intend to kill the victim and attempted to resuscitate the victim when he realized the victim was not breathing. Counsel also asked the court for mercy. Considering the totality of the circumstances, we conclude that defendant's counsel was not ineffective in failing to present additional evidence of the defendant's mental state in mitigation at the sentencing hearing.

The defendant also claims that his counsel was incompetent in failing to call his family members to testify in mitigation at the sentencing hearing. In support of this allegation, the defendant introduced the affidavits of four of his sisters, who attested that they would have been willing to testify at the sentencing hearing, but were not contacted by the defendant's attorney. Although the evidence at the post-conviction hearing established that defendant's counsel did not contact the defendant's family prior to the sentencing hearing, it did not persuasively establish that this failure was the result of counsel's negligence or incompetence. Counsel attested in his affidavit that he was unable to locate the defendant's family because he was not given their proper address.

Even if we assume that counsel was incompetent in failing to contact the defendant's sisters, we find for several reasons that the defendant did not suffer prejudice as a result. First, although the affidavits submitted at the post-conviction hearing state that the defendant's sisters believed that the defendant had a mental problem, the affidavits were by no means uniformly helpful to the defendant. Rather, they provide additional evidence of the defendant's violent behavior toward others. For example, the defendant's step-sister, Mary Hines, stated that the defendant attacked and choked her 21-year-old daughter at a family gathering in 1977 because

he had heard bad things about her in prison. The defendant's sister, Audrey Eddmonds, stated that the defendant threw a brick through her window and pulled a door off its hinges when he discovered that Audrey's best friend was a lesbian. Another sister, Lela Eddmonds, stated that the defendant became more vicious after he was released from prison and was intoxicated most of the time. Thus, the testimony of the defendant's family members could have adversely affected the defendant's chances of avoiding a death sentence, by introducing evidence of violent behavior which was not otherwise disclosed by the record.

Second, we conclude that the defendant was not prejudiced by counsel's failure to call family members in mitigation because the trial court was aware of and considered the defendant's troubled family background at the time of sentencing. In announcing its decision to sentence the defendant to death, the trial court specifically stated that it had considered mitigating factors contained in a social investigation report which outlined the defendant's family history, educational background and employment record. This report stated that the defendant's mother committed suicide in 1968 and that the defendant's family members blamed the defendant for her death. The report also indicated that the defendant had only a tenth-grade education, had attempted suicide on at least one occasion, and was incarcerated in the psychiatric ward of Menard for several months in 1973. Thus, the trial court had adequate evidence of the defendant's troubled background at the time of sentencing.

Finally, we conclude that the result of the sentencing proceeding would not have been different, even if defendant's counsel had presented the additional mitigating evidence introduced at the post-conviction proceeding. In assessing the prejudice prong of the *Strickland*

test when a defendant challenges a death sentence, the question is whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. (*Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.) The evidence that the defendant says his trial counsel should have offered at the sentencing hearing shows that the defendant's family loved him and believed he had a mental problem, and that experts disagreed as to whether the defendant was acting under an extreme emotional disturbance at the time of the crime.

Given the overwhelming aggravating evidence presented at the sentencing hearing, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances. The evidence established that the defendant saw the nine-year-old victim, Richard Miller, in the alley after Richard had apparently been raped by two men. The defendant tricked Richard into coming up to the defendant's apartment by promising to help him. Once Richard entered the apartment, the defendant forced him to undress and to submit to an act of anal intercourse. When the victim began to cry, the defendant pushed his face into the pillow and put all of his weight on the boy to prevent the victim from wakening the defendant's grandmother, who was in the apartment. When the defendant realized that the victim was dead, he stuffed the victim's naked body in a garbage dumpster in the alley. The evidence also established that the defendant was convicted of raping an 11-year-old girl in 1969. One month after he was released from prison for that rape, the defendant raped two other women, one of whom was eight months pregnant at the time of the rape. The evidence also established that the defendant had homosexually raped an-

other prison inmate while incarcerated in Cook County jail awaiting trial for the murder of Richard Miller. In view of the nature and extent of the aggravating evidence, we must conclude that the result of the sentencing proceeding would not have been different, even if counsel had presented the evidence raised in the post-conviction proceedings. Accordingly, we affirm the trial court's determination that the defendant was not deprived of the effective assistance of counsel at sentencing.

## III

The defendant finally argues that he was deprived of a fair post-conviction hearing because the trial court refused to allow two expert witnesses to testify and restricted his examination of three witnesses. We first consider whether the trial court erred in refusing to admit the proffered testimony of two experts. The defendant sought to present the testimony of two criminal defense attorneys who had participated in numerous murder trials. Both witnesses were prepared to testify that, after examining all of the relevant documents, they formed an opinion that defendant's trial counsel failed to render reasonably effective assistance at trial or at the sentencing hearing. The trial court denied the defendant's request to present this expert testimony, ruling that the testimony would not assist him in determining whether the defendant was deprived of the effective assistance of counsel.

Whether to allow the introduction of expert testimony is within the discretion of the trial court. (*People v. Mack* (1989), 128 Ill. 2d 231, 250.) A threshold requirement for the introduction of expert testimony is that the testimony will aid the trier of fact in reaching its conclusions. (*People v. Mack* (1989), 128 Ill. 2d 231, 250; *People v. Jordan* (1984), 103 Ill. 2d 192, 208.) The trial judge here specifically stated that he did not believe the proffered testi-

mony would assist him in determining whether defense counsel adequately investigated the defendant's mental fitness and potentially mitigating evidence. Given this finding, we cannot conclude that the trial judge abused his discretion in refusing to admit the expert testimony.

We also conclude that the trial judge did not err in limiting the defendant's examination of Dr. Reifman or Mr. Musburger. At the post-conviction hearing, the defendant attempted to elicit Dr. Reifman's expert opinion as to whether the defendant was fit for trial. The trial court sustained the State's objection to the defendant's question, in part because the question forced Dr. Reifman to speculate about whether the defendant was fit six years earlier. It was clear that Dr. Reifman did not examine the defendant between June 1978, when he found the defendant fit for trial with medication, and June 1980, when the trial was actually held. Thus, the trial court did not abuse its discretion in refusing to allow Dr. Reifman to give a speculative opinion as to whether the defendant was fit for trial. The trial court also did not err in refusing to allow Mr. Musburger to compare the defendant's mental problems with the mental problems suffered by his other clients. Such testimony was speculative and called for psychiatric expertise beyond that held by Mr. Musburger.

The defendant also claims that he was deprived of a fair post-conviction hearing when the trial court improperly limited his examination of Mr. McGinnis, his counsel at trial. Although the defendant raises a number of instances of alleged error, we find that, when viewed in the context of the entire record, the trial court's rulings did not deprive the defendant of a fair post-conviction hearing. The trial court properly sustained objections to a number of defense questions which were repetitive, had already been answered or were not relevant to the issues raised in the post-conviction petition. The defendant claims that the trial court erred in refusing to permit

post-conviction counsel to question McGinnis about his reason for calling Dr. Reifman to testify at the sentencing hearing and his reason for not asking Dr. Reifman to re-examine the defendant before the sentencing hearing. Although the post-conviction court did not explain its reason for sustaining the State's objections to such questions, the record does show McGinnis had repeatedly testified that he was unable to recall what preparation he made for the sentencing hearing, which was held six years earlier. Although the trial court could have allowed McGinnis to testify that he did not recall why he called Dr. Reifman at the sentencing hearing, we do not believe that the defendant was prejudiced by the fact that the trial court sustained the State's objection before McGinnis could so testify. Accordingly, we reject the defendant's contention that he was deprived of a fair post-conviction hearing.

## IV

In conclusion, we affirm the trial court's determination that the evidence failed to raise a *bona fide* doubt of the defendant's competency to stand trial. We also affirm its finding that the defendant was not deprived of the effective assistance of counsel at sentencing. We reverse, however, that portion of the trial court's order which granted the defendant's petition for post-conviction relief, vacated the defendant's death sentence, and remanded the cause for an evidentiary hearing. The defendant's death sentence is reinstated and the clerk of this court is directed to enter an order setting Tuesday, November 12, 1991, as the date on which the sentence of death entered by the circuit court of Cook County shall be executed in the manner provided by law. (See Ill. Rev. Stat. 1987, ch. 38, par. 119—5.) A certified copy of the mandate of this court shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville Correc-

tional Center, and to the warden of the institution wherein the defendant is confined.

*Affirmed in part;*
*reversed in part.*

JUSTICE CLARK, dissenting:

Because I believe that defendant was denied effective assistance of counsel, I respectfully dissent. Specifically, I disagree with the majority's conclusion that defendant was not prejudiced by his counsel's failure to pursue a judicial determination of his fitness to stand trial. I believe there was sufficient evidence to raise a *bona fide* doubt regarding defendant's fitness to stand trial. Therefore, defense counsel's failure to petition the trial court for a fitness hearing constitutes ineffective assistance.

In *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the Supreme Court set forth a two-pronged test for determining whether a defendant was denied his sixth amendment right to effective assistance of counsel. Under *Strickland*, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) In addition, defendant must show that he was substantially prejudiced by his counsel's deficiencies.

On the issue of prejudice, the majority correctly states that the question is whether defendant has established by a preponderence of the evidence that at the time of his trial, a *bona fide* doubt existed regarding his fitness to stand trial. However, in analyzing the evidence the majority seems to confuse the low evidentiary burden for raising a *bona fide* doubt with the more stringent burden defendant must meet to prevail at a fitness hearing. Rather than recognize that a conflict in the medical evidence creates a *bona fide* doubt, the majority resolves this

conflict in favor of defendant's fitness. By doing so the majority decides the merits of the fitness claim, without first giving defendant the benefit of a fitness hearing.

At this stage, defendant need only prove that the original trial court would have conducted a fitness hearing if it had been apprised of all the relevant facts. I believe defendant has met this burden. Two different judges in the trial court found a *bona fide* doubt regarding defendant's fitness to stand trial, and ordered a fitness hearing. Although these orders were never withdrawn the trial court never conducted a fitness hearing. Because defense counsel mistakenly believed that a hearing had already been held, he did not raise the issue with the judge who actually heard the case.

The fact that two judges in the trial court ordered a fitness hearing is highly persuasive evidence that a *bona fide* doubt existed at that time. The majority glosses over this evidence by referring to this court's holding in defendant's direct appeal (*People v. Eddmonds* (1984), 101 Ill. 2d 44), that defendant was not entitled to a fitness hearing. It is important to note that the issue on direct appeal was whether the trial court should have ordered a fitness hearing *sua sponte*. This court decided the trial court did not err. That decision was based on the fact that the most recent reports from mental health professionals showed that defendant was fit for trial, *that defense counsel did not make a further request for a fitness hearing*, and that defendant testified lucidly at the hearing on his motion to suppress as well as at trial. Although I believe this analysis was correct based on the facts known to this court at the time the direct appeal was decided, given the fact that defense counsel mistakenly believed that a fitness hearing had been held, I now believe that analysis is wrong.

In light of defense counsel's error, the factors enumerated by this court in defendant's direct appeal do not ne-

gate the existence of a *bona fide* doubt regarding defendant's fitness. The fact defense counsel thought a fitness hearing had already been conducted explains why he did not seek a fitness hearing. In addition, this fact explains why defense counsel did not seek to have defendant re-examined by a mental health professional regarding his fitness for trial.

At the time of trial, there was a conflict between the medical evidence available to the court. Doctors Reifman and Stipes had previously found defendant unfit for trial. Dr. Reifman later changed his opinion, stating that defendant was fit provided he took prescribed medication. Defendant was not taking the medication at the time of trial. On the other hand, Doctors Kaplan, Goldsmith and Rabin found defendant fit for trial, with no mention of medication. Even though none of the doctors were subjected to cross-examination on their opinions, the majority has decided that the more recent medical reports which found defendant fit are correct. By doing so, the majority implicitly finds that the opinions finding defendant unfit are incorrect. While the time of the examination is a relevant factor to be considered when assigning weight to the evidence, I do not believe that the mere passage of time should automatically render the opinions of Stipes and Reifman obsolete. I believe the conflicting medical testimony, combined with the observations of defendant's two attorneys that defendant was not fit, created a *bona fide* doubt regarding defendant's fitness, which doubt can only be resolved through a fitness hearing.

Finally, although not an issue in this appeal, I agree with Justice Goldenhersh's dissent in defendant's direct appeal, which found that defendant was arrested without probable cause. See *Eddmonds*, 101 Ill. 2d at 71 (Goldenhersh, J., dissenting).

For the foregoing reasons, I respectfully dissent.