# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 8, 2011 Session

## ANTHONY M. COLLIER v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Davidson County
### Nos. 2006-D-2932; 2007-C-2440    Cheryl Blackburn, Judge

---

### No. M2010-00433-CCA-R3-PC - Filed October 17, 2011

---

The petitioner, Anthony M. Collier, appeals the denial of post-conviction relief by the Criminal Court of Davidson County. He pled guilty to nine counts of aggravated robbery, a Class B felony, three counts of attempted aggravated robbery, a Class C felony, and one count of rape, a Class B felony. Pursuant to his plea agreement, the petitioner received an effective sentence of twenty-seven years in the Tennessee Department of Correction. On appeal, the petitioner claims that (1) he received ineffective assistance of counsel based on trial counsel's failure to request a mental health evaluation; and (2) his guilty pleas were not entered knowingly and voluntarily. Upon review, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Daniel Lyn Graves, II, Murfreesboro, Tennessee for the Defendant-Appellant, Anthony Collier.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Background**. In November of 2006, the petitioner was indicted for nine counts of aggravated robbery and three counts of attempted aggravated robbery. In a separate case, he was also indicted for one count of rape. On November 20, 2007, the petitioner entered a plea agreement under which he pled guilty to all of the indicted offenses in exchange for

concurrent terms of imprisonment on each count of attempted aggravated robbery, seven counts of aggravated robbery, and rape. However, the remaining two counts of aggravated robbery were ordered to be served consecutively to the concurrent term of imprisonment, for an effective sentence of twenty-seven years in the Tennessee Department of Correction. The facts supporting the guilty plea, as described by the State and stipulated to by the petitioner, were as follows:

> [T]he State's proof [for the aggravated robberies] would be that on these incidents, as the Court alluded to, Mr. Collier admitted to all of these in an interview with the police after he was caught. Also involved in these were Mr. Hambrick and a person who was referred to at that time as Mr. Corley but turned out to be named Mr. Dunlap. In various ones of these he was with one or both of those people as he went to do these robberies.
>
> Count 1 was a [sic] Swifty Oil Market. And they were accomplished with a deadly weapon. . . The victim was a Mr. Homer Connor. And he had money taken from him by Mr. Collier. And that date was March 8th, '06 [sic].
>
> The same date was [sic] the Old Hickory Market in Old Hickory. The employee there who was robbed was a Mr. Ecrum Donnel (phonetic). And he took money on that occasion.
>
> Count 3 was also March the 8th of 2006 at the Pizza Hut in Hermitage on Andrew Jackson Parkway. The employee was a Mr. David Parton, and money was taken.
>
> Count 4 was March the 19th, the same Pizza Hut in Hermitage. The employee on that day was a Mr. Daniel Flag where money was taken.
>
> Excuse me, Count 1 was an attempt. He didn't actually get any money on that first one.
>
> Count 5 was Roma's Pizza on North Gallatin Pike in Madison where the victim was a Mr. John Graham and money was taken.
>
> Count 6 was the Subway on Robinson Road in Old Hickory. The employee was Darmeesh Joshy (phonetic). Money was taken.
>
> Count 7 was the Shoney's on Gallatin Pike in Madison. The employee was Donald Boggs (phonetic), and money was taken.

Count[s] 8 and 9 were at Sir Pizza on Gallatin Road in Madison on March the 24th. The people who had money taken were Joshua Dillingham (phonetic) and Jason Carol.

Count 10 was March the 26th, '06. That was a Jumbo Buffet on Gallatin Pike. And the person who had money taken was a Mr. Edmond Chen.

Count 11 was an attempt, an unsuccessful one, at 31 West Liquors in Goodlettsville on March 27th. . .

And on that same day Buffalo Wild Wings on North Gallatin Road in Madison. The employee on Count 11 was Alice Reon (phonetic). And on Count 12 it was Maria Lata (phonetic).

. . . .

Okay. [The rape case] would be after Mr. Collier was arrested on [the robbery related] cases. He was in jail at the Criminal Justice Center here in Davidson County and had sex with another inmate [victim's name]. And [the victim] did not give his consent to that sexual intercourse.

Prior to the guilty plea, the petitioner moved to suppress a video recorded statement that he had provided to the police following his arrest. The petitioner argued, similarly to the claim in the instant petition, that he was unable to comprehend the waiver of his Miranda rights. The trial court conducted a suppression hearing on May 23, 2007. Detective Jason Rosalia of the Metropolitan Nashville Police Department testified that he interviewed the petitioner during the investigation. The interview was recorded by video and admitted as an exhibit to the hearing. Detective Rosalia stated, "I felt [the petitioner] was of sound mind and understood what was going on and what we were discussing." Detective Rosalia said the petitioner did not simply answer "yes" to the questions that were asked. He stated:

[The petitioner] would describe what he did with different cases, different locations, things of–what the victim looked like, what type of gun he used, who was involved, where they parked, just several different facts about each individual case.

Detective Rosalia did not observe anything abnormal or strange about the petitioner's behavior.

The petitioner testified that he graduated from high school, and had been in special needs classes for one or two years. He stated that he skipped classes, received tutoring in school, and that his grades were "[l]ike C's and D's." The petitioner testified that he did not

understand Detective Rosalia as he explained the Miranda rights waiver form, and did not recall signing it. The petitioner read aloud from the rights waiver form at the suppression hearing. On cross-examination, the petitioner claimed he "just went along with" Detective Rosalia during the interview. The petitioner was aware that he had the right to an attorney; however, he explained that he had never been arrested before he spoke to Detective Rosalia.

The trial court briefly questioned the petitioner about his decision to talk with law enforcement. The petitioner conceded that he was aware that he "could be quiet if he wanted to[.]" However, the petitioner chose to talk to law enforcement because "[he] thought if [he] talked to them they would probably let [him] go."

The petitioner's grandmother, Ira Beasley, testified that the petitioner received disability for chronic depression and being emotionally disturbed. She said the petitioner took medication. Additionally, while in school, the petitioner received counseling through the special education department.

In a written order denying the motion to suppress, the trial court stated:

> Here, Defendant provided inconsistent testimony at the hearing. Initially, Defendant said he was not advised of his rights. Defendant later altered his testimony and said he remembered discussing his rights but that he did not fully understand them. Then at another point Defendant said he knew he had the right to remain silent and could have counsel but he thought if he provided a statement right then he would be able to go home.

> The videotape presented to the Court speaks for itself. It shows that Detective Rosali[a] read and explained Defendant his rights to him. As reflected on the recording, the language used by Detective Rosali[a] was fairly simple and straightforward. The recording shows that Detective Rosali[a] read the rights, pausing after each one to inquire if Defendant had any questions. Defendant indicated he had no questions and said he wished to speak. The Court acknowledges that Defendant has a low level of functioning, but a review of the recording indicates Defendant understood his rights. Defendant provided no indication that his understanding was impaired by a mental condition. During the preliminary questioning, he led the officers to believe that he had completed the 12th grade. Further, Defendant was able to provide thorough and coherent responses to the police questioning about a complex series of robberies. Upon reviewing the totality of the circumstances, the Court finds the State has demonstrated by the preponderance of the evidence

that the Defendant understood his rights and waived them knowingly and voluntarily.

The trial court reviewed the motion to suppress at the guilty plea hearing and explained that the petitioner would no longer be able to contest the voluntariness of the confession by entering a guilty plea. The trial court also thoroughly examined the terms of the plea agreement and the underlying charges. The petitioner affirmed that he thoroughly discussed the case with trial counsel and that he provided a lengthy confession to law enforcement in this case. The petitioner stated that he had read the plea agreement with trial counsel, that he understood the ramifications of his decision to plead guilty, and that he did not have any questions. The petitioner further acknowledged that he was satisfied with trial counsel's performance. The trial court accepted the plea agreement after determining that the petitioner was fully apprised of his legal rights and made a voluntary decision to plead guilty. After the trial court announced that the petitioner would be transferred to the Tennessee Department of Correction, the following exchange occurred:

> [Defense Counsel]: Your Honor, one issue. I spoke with the family today and [the petitioner]. You may recall his school records, you reviewed those and everything.
>
> The Court: Yes.
>
> [Defense Counsel]: Given his mental disability, would the [c]ourt consider a recommendation to DeBerry? I've explained to him that does not mean he will go there just that —
>
> The Court: Why don't you do this, why don't you write a letter telling him that, you know, he has some issues and that the court just wants to bring it to their attention so they can consider that.
>
> [Defense Counsel]: I'll do that. Thank you, Your Honor.

No direct appeal was filed in this case, and on November 24, 2008, the petitioner filed an eighteen-page handwritten pro se petition for post-conviction relief. Following the appointment of counsel, an amended petition was filed. The petitioner argued that he did not enter the plea agreement knowingly and voluntarily, that trial counsel was ineffective because he failed to obtain a mental health evaluation, and that he was deprived of due process because the trial court failed to conduct a competency hearing.

**Post-Conviction Hearing**. The petitioner's aunt, Charlotte Harris, testified that she cared for the petitioner after his mother died in 2001. Harris testified that the petitioner attended special education classes while in school, and described the petitioner as "very withdrawn." Harris recalled that the petitioner's intelligence quotient (IQ) was sixty-seven. She spoke to the petitioner several times before he pled guilty. Harris asked the petitioner whether he understood what was happening with his case. She claimed the petitioner "didn't understand anything basically."

The petitioner's grandmother, Ira Beasley, had legal custody of the petitioner following the death of his mother. She testified that the petitioner was placed on disability at the age of ten, diagnosed with severe depression, and assigned to a special psychologist while in school. Beasley was familiar with a psychological report from the Nashville Metropolitan Public Schools and stated that it was part of the petitioner's educational assessment. The report, which was admitted into evidence, stated that a psychologist evaluated the petitioner in 2000. The "WISC III" was administered in December 1996 and resulted in a verbal IQ of sixty-five, a performance IQ of seventy-nine, and a full scale IQ of seventy. The petitioner also reportedly had '"significant depression with suicidal ideation and intent."' Beasley said she did not believe that the petitioner understood the substance of the plea agreement. She said "one of [the petitioner's] diagnoses was not being able to retain a lot of information that's given to him at one time."

Beasley stated that she knew when the petitioner did not understand something because "she helped raise him." To allay her concerns, Beasley asked the petitioner "if he really understood" the plea agreement. She said "Everything was kind of clumped together in the end in order to get a plea bargain." When Beasley explained that the rape would "follow" the petitioner, the petitioner told her "I didn't rape anybody... [i]t happened, but I didn't rape him." Finally, the petitioner told her that he was "tired of being downtown." Beasley tried to convince him otherwise, but the petitioner was "adamant" about his decision to plead guilty.

Trial counsel testified that his practice dealt almost exclusively with criminal matters. He was appointed to represent the petitioner after the previous attorney withdrew.[1] Trial counsel said he was appointed about two months before the petitioner entered the plea agreement. He was aware that the petitioner had mental limitations. Trial counsel said he reviewed the State's evidence with the petitioner and explained the nature of the charges. Trial counsel stated, "It was my impression that he seemed to grasp what he was facing and the nature of the charges and the evidence that was against him in the case." He said the petitioner "was interactive" during their discussions. Trial counsel stated, "It wasn't simply

---

[1]It should be noted that previous counsel handled the motion to suppress hearing.

yes and no responses. If that was all I was getting, I probably would have requested an evaluation myself." Trial counsel explained that he had considerable experience working with clients who had mental health issues. For several years, he represented patients at the Middle Tennessee Mental Health Institute who were admitted to the facility involuntarily. He also had experience with requesting mental health evaluations for other clients.

Trial counsel spoke to the petitioner "at great length" about the plea agreement. He stated, "We discussed the case, the evidence, the possible penalties, and his options." Trial counsel testified that the petitioner had "plenty" of time to think about the plea agreement, as it was offered almost a month and a half before the guilty plea hearing. On cross-examination, trial counsel said the IQ tests showed that the petitioner was "borderline mentally retarded." Trial counsel testified that he took measures to ensure that the petitioner understood the "important parts" of his case. Based on his interaction with the petitioner, trial counsel did not believe a mental evaluation was necessary.

Following the proof at the post-conviction hearing, the trial court denied the petition by written order. Although the court recognized that the petitioner exhibited a "low level of functioning," it determined that nothing in the recording showed that the petitioner did not understand his rights. The court found that the petitioner failed to demonstrate that his mental condition in any way impaired his ability to understand his rights under Miranda, and that no expert testimony was offered in support of this issue. The post-conviction court further noted that the trial court had already considered the submitted psychological evaluations at the suppression hearing. The trial court credited trial counsel's testimony regarding his ability to communicate with the petitioner. It stated that "the lines of communication were open and [the petitioner] was able to make a well-informed decision and assist in his defense." The post-conviction court also considered other evidence of the petitioner's cognizant abilities:

> [T]he CD containing the interview of Petitioner's police interview (which was considered by this Court during the suppression hearing and was admitted in the post-conviction hearing as Ex. 7) demonstrates Petitioner's lucidity and responsiveness to questioning. And, the transcript of the guilty plea hearing shows that the Court carefully reviewed with Petitioner the rights that he was waiving and confirms that Petitioner responded appropriately to questioning. Trial counsel questioned Petitioner's mental disability to the Court during the guilty plea hearing when determining whether Petitioner would be recommended for the DeBerry Special Needs facility. Thus, even though Petitioner's mental limitations did not rise to the level to create a defense or prevent him from knowingly and voluntarily entering a plea, they were addressed as far as appropriate sentencing in this matter.

The post-conviction court denied the petition upon finding that the claims were not proven by clear and convincing evidence. The petitioner filed a timely notice of appeal.

## ANALYSIS

**I. Ineffective Assistance of Counsel**.[2] The petitioner claims he received ineffective assistance of counsel because "failure to insist on [a] mental examination was fatal to [his] defense." He contends a mental health evaluation was needed because, based on his low IQ scores and placement in special education classes, he lacked the mental ability to understand the criminal process. Because of his low level of functioning, the petitioner further argues that his guilty pleas were not knowingly and voluntarily entered. In response, the State argues that the petitioner failed to show that a mental evaluation was necessary and that no expert testimony was offered to show that the petitioner could not comprehend the criminal process. The State also asserts that the petitioner failed to testify that he would have rejected the plea agreement.

**Standard of Review**. Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation marks and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the

---

[2]Although the record does not show that the petitioner's 18-page handwritten pro se petition for post-conviction relief was incorporated into the amended petition for post-conviction relief, we have nevertheless reviewed both petitions. We note that the pro se petition raises several other issues not raised before the post-conviction court or in the petitioner's appellate brief to this court. Consequently, this appeal is limited to the issues addressed herein, and all other issues are waived.

conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 370. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068).

As we understand the issues raised by the petitioner, he essentially claims that (1) he was not competent to enter a guilty plea, (2) "his federal and state due process rights were violated when the trial court failed to conduct a sua sponte competency hearing when the trial court was on notice that the petitioner may have mental health limitations"; and (3) trial counsel was ineffective for failing to request "a mental health and mental capacity evaluation."[3]

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." Drope v. Missouri, 420 U.S. 162, 171 (1975). The test applicable under the federal constitution in evaluating a defendant's mental competency to stand trial was set forth by the United States Supreme Court in Dusky v. United States, 362 U.S. 402 (1960), as:

---

[3]In his appellate brief to this Court, the petitioner casts this sub-issue as "Failure to Effectively Communicate with Appellant." There is one sentence stating that "trial lawyers failed to adequately communicate with him during his incarceration." The remaining two paragraphs address the trial court's failure to sua sponte conduct a hearing regarding his mental competency.

[W]hether [the petitioner] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him.

Drope, 420 U.S. at 171; see also State v. Black, 815 S.W.2d 166, 173-74 (Tenn.1991) (adopting the federal standard in Tennessee); State v. Leming, 3 S.W.3d 7, 8-9 (Tenn. Crim. App.1998).

However, "[n]ot all people who have a mental problem are rendered by it mentally incompetent." Wilcoxson v. State, 22 S.W.3d 289, 313 (Tenn. Crim. App.1999) (citing Bouchillon v. Collins, 907 F.2d 589, 593 (5th Cir.1990); see also, e.g., Galowski v. Berge, 78 F.3d 1176, 1182 (7th Cir.1996) (citation omitted) ("'[n]ot every manifestation of mental illness demonstrates incompetence to stand trial'"); United States v. Hogan, 986 F.2d 1364, 1373 (11th Cir.1993)(mental illness is not, in itself, enough to establish incompetence); People v. Eddmonds, 143 Ill.2d 501, 161 Ill.Dec. 306, 578 N.E.2d 952, 960 (1991)("[a] defendant may be competent to participate at trial even though his mind is otherwise unsound"). "Conversely, courts have acknowledged that, even if a criminal defendant has an intellectual understanding of the charges against him, he may be incompetent if his impaired sense of reality substantially undermines his judgment and prevents him from cooperating rationally with his lawyer." Id. (internal citations omitted). "[I]n the context of post-conviction claims that trial counsel rendered ineffective assistance by failing to raise the issue of competency, the burden must remain upon the petitioner to establish a reasonable probability that he was, in fact, incompetent at the time of his trial." Id. at 313.

Additionally, and pertinent to the issues raised herein, whether an individual is competent to plead guilty and whether a guilty plea is knowing and voluntary are two separate and distinct inquiries. See Moten v. State, 935 S.W.2d 416, 420 (Tenn. Crim. App. 1996) (citing Godinez v. Moran, 509 U.S. 389, 399-401 (1993)). In Moten, this court acknowledged:

The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the proceedings. The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced.
. . . .

When it is believed that an accused is incompetent to stand trial or waive his or her rights, it is the duty of the court to conduct a hearing for the purpose of inquiring into the competence of the accused, and, where warranted, ordering

a psychiatric examination and evaluation of the accused. This duty exists even in the absence of a motion seeking such a hearing. Failure to order a hearing when the evidence raises a sufficient doubt as to an accused's competence to stand trial or enter a guilty plea deprives the accused of due process of law.

Id. (internal citations omitted).

The petitioner cites Pate v. Robinson, 383 U.S. 375, 384-385 (1966) and Osborne v. Thompson, 481 F. Supp. 162 (M.D. Tenn.), aff'd, 610 F.2d 461 (6th Cir. 1979) in support of this issue. In Pate v. Robinson, the United States Supreme Court disagreed with the Illinois Supreme Court and concluded that "the evidence raise[d] a 'bona fide doubt' as to [the] defendant's competence to stand trial," which required the judge to conduct a sanity hearing sua sponte. The Court observed that "the mental alertness and understanding displayed in [the petitioner's] 'colloquies' with the trial judge" did not justify "ignoring the uncontradicted testimony of [the petitioner's] history of pronounced irrational behavior." Pate, 383 U.S. at 385. The Court later clarified Pate, and explained

evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

Drope, 420 U.S. at 180.

In Osborne v. Thompson, the petitioner claimed that the trial court should have conducted a competency hearing prior to accepting his plea and pronouncing judgment. Because a mentally incompetent defendant cannot enter a valid guilty plea, the federal district court determined that the Tennessee state court violated the petitioner's due process rights. The district court stated that there were several indicators of mental impairment throughout the proceedings which should have triggered further inquiry by the state court. Osborne, 481 F.Supp. at 167. The Sixth Circuit agreed. See Osborne, 610 F.2d at 462-63. The Osborne court recognized that the need for a competency determination is ultimately made on a case-by-case basis, although there must be some threshold showing "that 'something is amiss'" before the trial court is obliged to conduct an inquiry. Osborne, 481 F.Supp. at 170.

-11-

In this case, although the trial court did not conduct a separate competency hearing, previous trial counsel challenged the voluntariness of the petitioner's confession at the suppression hearing based on the same evidence relied upon at the post-conviction hearing. Thus, prior to the entry of the guilty plea, the trial court was afforded an opportunity to assess the petitioner's competency. The post-conviction court again reviewed the petitioner's responses to questions at the suppression hearing and his responses during the guilty plea colloquy. It further considered the video recording of the petitioner's confession to law enforcement, testimony of family members, and a past psychological evaluation. The video shows the petitioner to be actively engaged in the question and answer process with Detective Rosalia. Although the petitioner's grandmother testified that he could not easily process large amounts of information, she also confirmed that the petitioner insisted upon pleading guilty to the offenses in this case. The psychological report showed that the petitioner was evaluated on October 17, 2000, October 24, 2000, and November 7, 2000. It provided, among other things, that the petitioner had a full scale IQ of seventy.

Upon our review of the record, we are unable to conclude that the evidence "rais[ed] a sufficient doubt as to [the petitioner's] competence to stand trial or enter a guilty plea" so as to deprive the petitioner of due process of law. Significantly, unlike Pate or Osborne, trial counsel in this case had experience with clients of questionable mental health and was aware of the petitioner's mental health limitations. In trial counsel's professional judgment, it was unnecessary to obtain a mental health examination or evaluation of the petitioner because the petitioner "grasp[ed]" the nature of the charges, the evidence against him, and "was interactive" throughout the process. The post-conviction court accredited trial counsel's testimony. The record does not preponderate against the findings of the post-conviction court. As such, the trial court was not required to sua sponte order a psychiatric examination of the petitioner. The petitioner has failed to carry his burden of proof on this issue; therefore, he is not entitled to relief.

The petitioner also contends that trial counsel was ineffective for failing to request a mental health evaluation. The State argues that the record supports the post-conviction court's denial of relief on this issue. In this regard, trial counsel testified that he was well aware of the petitioner's mental health limitations. The record shows that trial counsel had extensive experience with clients with mental health issues. Based on his experience, trial counsel did not believe that an evaluation of the petitioner was necessary. Other than his family members and the psychological evaluation, the petitioner did not present any testimony regarding his mental capacity. The post-conviction court accredited trial counsel's testimony that the petitioner made an informed decision to plead guilty, and that in counsel's professional judgment, an evaluation was not necessary. This court shall not re-evaluate such credibility determinations. See Vaughn, 202 S.W.3d at 115. The petitioner has failed to prove deficient performance or prejudice. Therefore, he is not entitled to relief on this issue.

**II. Guilty Plea**. The petitioner claims he did not enter the plea agreement knowingly and voluntarily. He argues that his mental health limitations prevented him from understanding the nature of the charges and the consequences of pleading guilty. In response, the State claims the evidence shows that the petitioner pled guilty knowingly and voluntarily. The State asserts that the transcript from the plea hearing establishes that the petitioner made an informed decision to plead guilty. The State also asserts that the petitioner failed to testify at the post-conviction hearing about his comprehension of the plea proceeding. Upon review, we agree with the State.

When analyzing the validity of a guilty plea, we follow the federal landmark case of Boykin v. Alabama, 395 U.S. 238 (1969), and the Tennessee landmark case of State v. Mackey, 553 S.W.2d 337 (Tenn. 1977), superseded on other grounds by rule as stated in State v. Wilson, 31 S.W.3d 189, 193 (Tenn. 2000). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that a trial court may not accept a guilty plea unless there is an affirmative showing that the guilty plea was "intelligent and voluntary." 395 U.S. at 242. When accepting a guilty plea, the trial court is responsible for "canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." Id. at 244. In Mackey, the Tennessee Supreme Court held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea; otherwise, it will not amount to an 'intentional abandonment of a known right.'" 553 S.W.2d at 340.

The Tennessee Supreme Court has emphasized that a plea is not voluntary if it is the result of "'[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin, 395 U.S. at 242-43). A trial court must look at a number of circumstantial factors before determining whether a guilty plea is voluntary and intelligent. Id. These factors include "the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial." Id. (citing Caudill v. Jago, 747 F.2d 1046, 1052 (6th Cir. 1984)).

In viewing the record, we conclude the post-conviction court properly found that the guilty plea was knowingly and voluntarily entered. The petitioner has not shown that the plea agreement was the result of ignorance or incomprehension. See Blankenship, 858 S.W.2d at 904 (quoting Boykin, 395 U.S. at 242-43). Moreover, the petitioner has failed to

establish that "counsel's constitutionally ineffective performance affected the outcome of the plea process." Hill v. Lockhart, 474 U.S. 52, 59 (1985). Here, the petitioner was required to show "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id.; see Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App.1998). However, the petitioner did not testify at the post-conviction hearing, and the record is devoid of any proof showing that but for counsel's advice, the petitioner would have insisted upon a trial. The transcript from the plea hearing shows that the trial court questioned the petitioner in compliance with Rule 11(b) of the Tennessee Rules of Criminal Procedure. The petitioner affirmed that he understood the terms of the plea agreement and that he wished to plead guilty. He also affirmed that he understood the charges against him, the potential sentences for these charges, the State's evidence, and the rights waived by pleading guilty. The petitioner denied that he had any questions about the plea proceeding. At the post-conviction hearing, trial counsel said he spoke with the petitioner about the plea agreement on more than one occasion. Trial counsel stated that the petitioner was interactive during their discussions and was able to grasp the circumstances of his case. Trial counsel said the petitioner had plenty of time to think about the plea agreement because it was offered over a month before the plea hearing. The petitioner has not shown by clear and convincing evidence that the trial court erred in its decision. Accordingly, he is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE

-14-