2019 IL App (1st) 170151-U

No. 1-17-0151

October 23, 2019

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 10902 |
| | ) | |
| JASON BURNS, | ) | Honorable |
| | ) | Allen F. Murphy, |
| Defendant-Appellant. | ) | Judge Presiding. |

---

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Ellis and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court properly entered a summary dismissal of defendant's *pro se* postconviction petition when the petition failed to state a claim that he was arguably denied the effective assistance of counsel.

¶ 2    Defendant Jason Burns appeals from the summary dismissal of his *pro se* petition for

relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West

2016)). He contends that the circuit court erred when it summarily dismissed the petition because

it set forth a claim that he was arguably denied the effective assistance of counsel when counsel failed to request a fitness hearing. We affirm.

¶ 3    Following a bench trial, defendant was found guilty of one count of first degree murder (720 ILCS 5/9-1(a)(2) (West 2010)), and three counts of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2010)), arising out of the shooting death of Adam Martinez. Defendant was sentenced to a total of 35 years in prison.

¶ 4    The evidence at trial established that on May 12, 2010, Tomaras Qualls and Jabriel Anderson (Jabriel) got into a fight. Afterwards, Jabriel and a group including Raymond Darden, Cortez Robinson, Cory Anderson (Cory), and defendant attempted to find Qualls. The evidence further established that defendant fired a firearm at a vehicle that Jabriel believed contained Qualls, left the scene of the shooting with a firearm, and gave a firearm to Cory several days later.

¶ 5    Darden testified that on the night of the shooting, he was with Robinson. At one point, Darden received a phone call from Jabriel. After the phone call, Darden and Robinson went to Cory's house. Defendant then arrived in a red SUV. Robinson and Cory approached the SUV, and Darden heard defendant say " 'We good.' " Darden then drove himself and Robinson to "K-Rock's" house. Defendant and Cory rode in the red SUV. Once there, Darden and Robinson exited their vehicle and Darden knocked on the front door. Jabriel came out and said that Qualls was trying to fight him. The entire group, including defendant, then walked to Qualls's house. After discovering that Qualls was not home, Jabriel said he was going "to f*** [Qualls] up." As the group walked back, they saw a silver Monte Carlo drive by twice. Jabriel became "hysterical" because he thought Qualls was in the vehicle, and asked for the "cappa." Darden

explained that a cappa is a firearm. Darden and Cory separated from the group to see who was in the car. However, Cory "faded back" toward the rest of the group. Darden then heard gunshots, but did not see who was shooting. Darden ran to his vehicle, as did Jabriel and Robinson. Neither Jabriel nor Robinson had a firearm.

¶ 6     Jasmine Johnson testified that in 2010, she was in a relationship with defendant. Around 9 p.m. on May 12, 2010, she and defendant were watching television at his house when he received a phone call. Johnson was close enough that she could hear the caller's voice and recognized him as Cory. A few minutes later, defendant drove them to Cory's house in Johnson's red SUV. When they arrived, defendant exited the vehicle and talked to Cory. Johnson observed a group of "boys" standing outside a blue SUV. Defendant and Cory then entered Johnson's SUV and the boys got into the blue SUV. Defendant followed the blue SUV and parked in a driveway. At one point, defendant and Cory left their identification and money in Johnson's SUV and walked away with the people from the blue SUV. Johnson then lost sight of the group. After a few minutes she heard gunshots. Defendant and Cory ran back and entered Johnson's SUV. Johnson observed that defendant had a "little figure" that "appeared" to be a firearm. She thought it was a firearm because she could see the handle. She asked defendant why he had a firearm in her vehicle. He did not answer her and they did not discuss what happened.

¶ 7     During a phone conversation the following day, Johnson asked defendant what had happened, and defendant responded that Jabriel "was having some problems, so they took care of it." Defendant also stated that someone had been shot and that he was sick to his stomach. On May 15, 2010, Johnson picked defendant up at his house and he directed her to drive to Cory's house. When defendant entered the vehicle, she saw a handle on "his left-hand side to the front,"

and believed that it was a firearm. She did not say anything to defendant. After defendant exited the vehicle, she observed him give the firearm to Cory. It looked like the firearm defendant possessed on May 12, 2010.

¶ 8     Marquell Carter testified that on May 12, 2010, Jabriel and Qualls got into a fight at Xavier Smith's house. The men were separated, but then fought outside the house. Jabriel beat up Qualls, and Qualls "walked off." Qualls later returned with two or three male friends and Carter let them inside. Qualls's group left and then returned, trying to get Jabriel out of the house. Jabriel, however, made a phone call. When Carter later answered the door, he saw Darden and Robinson outside. Cory and defendant were also present. Cory had a gun in his waistband. Jabriel came to the door, and stated that Qualls wanted to fight. The group, including defendant and Jabriel, then left, saying they were going to Qualls's house. Carter stayed at Smith's house.

¶ 9     From the doorway, Carter observed the group return. The group was standing in the driveway when a gray Monte Carlo approached and pulled into a nearby parking lot. Carter observed Cory pull a firearm from his waistband and heard "somebody" say "that's them *** or something." Defendant took the gun from Cory and ran to the vehicle. At that point, Carter closed the door and moved to watch through a window. He saw defendant shooting a firearm toward the Monte Carlo, and people exiting the Monte Carlo and running away. Carter later identified defendant in a photographic array as the shooter. He admitted that he was given immunity by the State in exchange for his testimony.

¶ 10    Robert Alvarado, Andre Johnson, and Brian Lawson testified they and Martinez were in Martinez's Monte Carlo when they heard gunshots and thereafter saw Martinez with a head injury.

¶ 11    The trial court found defendant guilty of one count of first degree murder and three counts of aggravated discharge of a firearm. Counsel filed a motion for a new trial. Defendant later obtained new counsel, and posttrial counsel filed a supplemental motion for a new trial. After the court denied defendant a new trial, posttrial counsel noted that defendant's psychiatric records, which the defense believed were relevant in mitigation, had been filed with the court under seal.

¶ 12    At sentencing, posttrial counsel again stated that the records of defendant's psychiatric history had been submitted to the court. Posttrial counsel noted that defendant had been diagnosed and treated for intermittent explosive disorder and bipolar disorder, and always showed "significant improvement" after inpatient treatment. Posttrial counsel further noted, however, that defendant's mother was not always able to ensure that defendant took his medication.

¶ 13    The court sentenced defendant to 30 years in prison for first degree murder and to three 5-year terms for aggravated discharge of a firearm. The sentences for aggravated discharge of a firearm were to be served concurrent to each other and consecutive to the sentence imposed for first degree murder. The defense made an oral motion for a reduction in sentence, which the court denied. On appeal, this court affirmed defendant's conviction while also granting appellate counsel's motion to withdraw filed pursuant to *Anders v. California*, 386 U.S. 738 (1967). See *People v. Burns*, 2015 IL App (1st) 132215-U.

¶ 14    In June 2016, defendant filed the instant *pro se* petition for postconviction relief alleging, in pertinent part, that he was denied the effective assistance of counsel when trial counsel failed to investigate defendant's "mental history" despite defendant telling counsel that he had been

hospitalized twice, diagnosed with bipolar disorder and prescribed "Depakote," and was housed in the "psychiatric" division of the jail. The petition further alleged that counsel's failure to investigate defendant's mental history prevented defendant from obtaining a "retrospective hearing" before trial. The petition concluded that had defendant received a "hearing," counsel could have then "sought to have the burden of responsibility lowered to a lesser included offense, from first degree murder to second degree murder." A "Discharge Summary" from Riveredge Hospital and defendant's affidavit were attached to the petition.

¶ 15    The Discharge Summary stated that defendant had been diagnosed with "Bipolar, manic, cannabis and alcohol abuse," and had undergone in-patient treatment from April 26, 2008 until May 16, 2008. In his affidavit, defendant averred that during an August 18, 2010 meeting with counsel, he told counsel that he had previously been hospitalized at Hartgrove Hospital and Riveredge Hospital, and had been diagnosed "Bipolar" and placed on Depakote. Defendant further averred that he told counsel that he had not taken his medication since July 2008. Defendant finally averred that while in jail, he was housed in the psychiatric division and took his medication.

¶ 16    On July 18, 2016, the circuit court summarily dismissed the petition as frivolous and patently without merit. Defendant filed a *pro se* notice of appeal in the circuit court on December 22, 2016. On September 17, 2017, our supreme court entered a supervisory order directing this court to treat defendant's notice of appeal as a "properly perfected appeal" from the circuit court's July 18, 2016 order dismissing defendant's *pro se* postconviction petition. Defendant now appeals.

¶ 17　The Act provides a procedural mechanism through which a defendant may assert a substantial denial of his constitutional rights in the proceedings which resulted in his conviction. 725 ILCS 5/122-1 (West 2016). At the first stage of a postconviction proceeding, the circuit court independently reviews the petition, taking the allegations as true, and determines if it is frivolous or patently without merit. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). Our supreme court has held that "a *pro se* petition seeking postconviction relief under the Act for a denial of constitutional rights may be summarily dismissed as frivolous or patently without merit only if the petition has no arguable basis either in law or in fact." *Id.* at 11-12. A claim has no arguable basis when it is based on an indisputably meritless legal theory, such as one completely contradicted by the record, or a fanciful factual allegation, such as those that are fantastic or delusional. *People v. Brown*, 236 Ill. 2d 175, 185 (2010). This court reviews the summary dismissal of a postconviction petition *de novo*. *People v. Tate*, 2012 IL 112214, ¶ 10.

¶ 18　In his *pro se* petition, defendant contends that he was arguably denied the effective assistance of trial counsel when, despite knowing defendant's mental health history, counsel failed to further investigate and this failure denied defendant a "retrospective hearing" before trial. On appeal, defendant contends that the allegations in his petition and supporting documents, taken as true, state an arguable claim that counsel was ineffective because counsel's failure to investigate defendant's mental health history meant that counsel never requested a "fitness hearing."

¶ 19　The State responds that defendant's petition alleged that defendant was denied the effective assistance of counsel based upon counsel's failure to have defendant evaluated in order

to mitigate his culpability for Martinez's murder, and argues that defendant raises a new theory on appeal, that is, counsel should have requested a hearing to determine his fitness for trial.

¶ 20    While we agree with the State that defendant's petition does not use the phrase "fitness hearing," it does allege that trial counsel failed to investigate his mental health history and that this failure "denied me the right to receive a retrospective hearing before trial." We note that our supreme court has held that a defendant need only "allege enough facts to make out a claim that is arguably constitutional for purposes of invoking the Act." *Hodges*, 234 Ill. 2d at 9. Here, the petition contained sufficient facts to set forth defendant's claim that counsel's alleged failure to investigate his mental health history resulted in the omission of a fitness hearing.

¶ 21    To prevail on a claim of ineffective assistance, a defendant must show both that counsel's performance "fell below an objective standard of reasonableness" and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "At the first stage of postconviction proceedings under the Act, a petition alleging ineffective assistance may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Hodges,* 234 Ill. 2d at 17. A defendant's failure to establish either *Strickland* prong is fatal to his claim of ineffective assistance of counsel. *People v. Cherry*, 2016 IL 118728, ¶ 24.

¶ 22    In the context of a first stage postconviction proceeding alleging ineffective assistance of counsel, a defendant need only allege some objective facts that support both prongs of *Strickland* and can be corroborated, or provide an explanation as to why those facts are absent. See *Hodges*, 234 Ill. 2d at 10. Mere speculation or conjecture, however, is not enough to justify a claim of ineffective assistance of counsel. *People v. Cooper*, 2013 IL App (1st) 113030, ¶ 58.

¶ 23    In the case at bar, defendant argues that trial counsel knew that defendant was housed in the jail's psychiatric division, taking medication for bipolar disorder, and had previously undergone inpatient psychiatric care. According to defendant, counsel was deficient for failing to further investigate defendant's mental health history, and thus denied defendant the opportunity for a fitness hearing before trial. Based on the record before us, the circuit court properly summarily dismissed the instant petition.

¶ 24    A defendant is presumed fit to stand trial. 725 ILCS 5/104-10 (West 2010). However, due process bars the prosecution of an unfit defendant. *Brown*, 236 Ill. 2d at 186. A defendant is unfit to stand trial if, due to a mental or physical condition, he is unable to understand the nature and purpose of the proceedings or to assist in the defense. 725 ILCS 5/104-10 (West 2010). The fact that a defendant suffers from a mental impairment, or is using psychotropic medication, does not necessarily lead to the conclusion that he is mentally unfit for trial. *People v. Easley*, 192 Ill. 2d 307, 322-23 (2000).

¶ 25    The issue of a defendant's fitness for trial may be raised at any time by either party or the trial court. 725 ILCS 5/104-11(a) (West 2010). When a *bona fide* doubt regarding a defendant's fitness is raised, the trial court shall order a fitness hearing. *Id.* A number of factors may be considered when determining whether a *bona fide* doubt of fitness is raised, including a defendant's irrational behavior, his demeanor at trial, any prior medical opinion on the defendant's competence, and any representations by defense counsel on the defendant's competence. *Brown*, 236 Ill. 2d at 186 (citing *People v. Eddmonds*, 143 Ill. 2d 501, 518 (1991)). However, no fixed or immutable sign "invariably indicates the need for further inquiry on a defendant's fitness." *Id*. Instead, "the question is often a difficult one implicating a wide range of

manifestations and subtle nuances." *Id*. The issue is not "mental illness"; rather, it is whether defendant could understand the proceedings against him and cooperate with counsel in his defense. *Easley*, 192 Ill. 2d at 323.

¶ 26 Here, defendant does not allege in his petition that his mental illness or the psychotropic medication he was taking to treat it in any way interfered with his ability to understand the proceedings in his case. Moreover, the petition failed to provide any facts upon which that conclusion could be made. The petition merely indicates that defendant was taking his medication while in jail. Defendant fails to explain how an investigation of his mental health history would have resulted in trial counsel bringing the issue of defendant's mental health history to the trial court. Further, defendant does not argue that had such a fitness hearing taken place, he would have been found not fit to stand trial. Absent some factual support for defendant's argument that there was a *bona fide* doubt of his mental fitness, other than the mere fact that he had previously been diagnosed with bipolar disorder and placed upon medication, he cannot show that he was arguably prejudiced by trial counsel's failure to raise the issue of his mental health before the trial court.

¶ 27 We are unpersuaded by defendant's reliance on *People v. Brown*, 236 Ill. 2d 175 (2010). In that case, the defendant, who was shot by police after lunging at an officer with a butcher knife, was convicted of attempt first degree murder of a peace officer. At sentencing, the defendant stated that he had been depressed, had previously tried to kill himself, and had lunged at the officers because he wanted them to kill him. The defendant filed a postconviction petition alleging ineffective assistance of counsel based on counsel's failure to request a fitness hearing. In support thereof, the defendant attached medical records documenting his bipolar disorder and

his medications to treat it, as well as affidavits from relatives who averred that defense counsel had been informed that the defendant was taking medication to treat his disorder and was previously suicidal. In his petition, the defendant alleged that on the day of the offense, he was attempting " 'suicide by police.' " *Id.* at 181. The petition also alleged that because of the medication treating his bipolar disorder, the defendant had difficulty understanding the nature of proceedings against him. *Id.* The circuit court summarily dismissed the defendant's petition. *Id.* at 181-82.

¶ 28    Our supreme court remanded the case for second stage proceedings. In doing so, the supreme court found that the nature of the offense, along with the defendant's allegation that defense counsel knew that defendant was taking psychotropic medication for bipolar disorder and that he had previously attempted suicide, as well as the defendant's allegation that the medication caused an inability to understand the trial proceedings, arguably raised a *bona fide* doubt of the defendant's ability to understand the nature and purpose of the proceedings and assist in his defense. *Id.* at 191. Accordingly, the supreme court concluded that counsel's failure to request a fitness hearing arguably fell below an objective standard of reasonableness and prejudiced the defendant (*id.*), and remanded the cause for further proceedings under the Act (*id.* at 194).

¶ 29    Here, defendant was convicted of first degree murder and aggravated discharge of a firearm, and there is no indication that defendant was suicidal or that his actions in shooting Martinez were a suicide attempt. More importantly, however, unlike the defendant in *Brown*, in the case at bar, defendant's *pro se* postconviction petition did not allege that defendant did not

understand the trial proceedings due to the medication that he was taking, nor provide any facts or documentation from which such a conclusion could be inferred.

¶ 30    Accordingly, because defendant failed to set forth an arguable claim of ineffective assistance of counsel, the circuit court did not err when it summarily dismissed his *pro se* postconviction petition. *Hodges*, 234 Ill. 2d at 16-17.

¶ 31    Accordingly, we affirm the order of the circuit court of Cook County.

¶ 32    Affirmed