2025 IL App (2d) 240605-U
No. 2-24-0605
Order filed November 4, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-1936 |
| MICHAEL MONTELEONE, | ) ) ) | Honorable John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*: (1) Sufficient evidence supported defendant's conviction of predatory criminal sexual assault of a child where the victim's trial testimony that defendant licked her vagina was supported by her prior statements, and any inconsistencies were the fact finder's province to resolve. (2) Defense counsel was not ineffective for failing to seek a discovery sanction for the State's alleged failure to disclose text messages in which defendant admitted to the victim's mother that he might have committed the charged act. There was no indication that the State was aware of the messages or could have discovered them through the exercise of due diligence. Moreover, defense counsel's decision not to seek a sanction was a reasonable trial strategy.

¶ 2   Defendant, Michael Monteleone, appeals his conviction of predatory criminal sexual

assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)). He contends that (1) the State failed to

prove him guilty beyond a reasonable doubt and (2) he was denied the effective assistance of counsel when his trial attorney failed to move for discovery sanctions based on the State's alleged failure to disclose text messages between defendant and the victim's mother. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On December 7, 2022, defendant was indicted on one count each of predatory criminal sexual assault of a child (*id.*) and aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)). The charges stemmed from defendant's act of placing his tongue on the vagina of A.S., a person under the age of 13, on or about March 3, 2018, through March 2, 2020. A.S. was the daughter of defendant's girlfriend, Alicia F.H.

¶ 5      On February 28, 2023, the State filed a motion of intent to introduce out-of-court statements made by A.S. to the following individuals: (1) H.T., defendant's niece; (2) A.G., A.S.'s cousin; (3) Alicia; (4) Renee M., Alicia's mother; and (5) Deanna Velazquez, an investigator with the Kane County Child Advocacy Center (CAC). Following a hearing, the trial court granted the State's motion as to all statements but those made to Renee. The matter proceeded to a bench trial.

¶ 6                                    A. Bench Trial

¶ 7                                    1. A.S.'s Testimony

¶ 8      A.S. testified that she was born on March 3, 2010, and was 13 years old. She currently lives with her mom, Alicia. She used to live with Alicia and defendant in Elgin. When she lived in Elgin, she had her own bedroom; Alicia and defendant shared a bedroom. A.S. identified photographs of (1) the Elgin house, (2) her bedroom, and (3) Alicia and defendant's bedroom, which were admitted into evidence.

¶ 9      A.S. testified that, when Alicia was away, A.S. would sleep with defendant in his and Alicia's bedroom. On one such occasion, while Alicia was in Arizona attending a funeral, A.S.

slept with defendant. One evening during that time, defendant touched A.S.'s vagina with his tongue, which moved "back and forth" on her. She stated that he touched her "[u]nder" her clothes. She was wearing shorts and a tank top with "popcorn and like movie snacks" on them. She was also wearing underwear. After defendant stopped licking her, he lay back down, and A.S. went to her room. She testified: "I locked the door and laid down." Before she left defendant's room, defendant did not say anything to her about not telling. A.S. testified that she eventually told (1) R., who was her "friend on the bus"; (2) Alicia; (3) H.T.; and (4) A.G. "[A] couple weeks later," Alicia took A.S. to the CAC, and A.S. spoke with a detective.

¶ 10    On cross-examination, A.S. testified that she and Alicia moved in with defendant when she was about three years old. A.S. was eight years old when defendant touched her. When asked if the year "would have been about 2018," she answered, "Yeah." Defendant was already in his bed when A.S. entered his room and lay down; the television and lights were off. A.S. stated that it "looked like" he was sleeping. When asked whether her bedroom door had a lock on it, she replied, "I don't think so." A.S. agreed that she would lie in Alicia and defendant's bed when she was younger. She also agreed that she would do so when Alicia was out of town. She continued to do so until "[m]aybe like a week before" she moved out of the house in 2022.

¶ 11    A.S. testified that, during the incident, defendant put a pillow over her face and pulled off her shorts. The pillow was "[j]ust laying there" on her face. Because of the pillow, she was unable to see defendant, but she could have removed the pillow. It felt like defendant's tongue was touching her vagina for about "[f]ive-ish minutes" before he returned to where he was originally lying. She did not say anything to him. She testified that she was "kind-of like froze" and "kind-of like scared." She got up and went to her room. Defendant did not say anything to her at that time. A.S. testified that Alicia arrived home "[a]bout a day later," but A.S. did not tell her what

had happened. A.S. did not tell her mom what happened until "about four years later," in 2022. When defense counsel asked whether she told Alicia that she "thought it was a dream," she replied, "No, not really." She denied ever telling Alicia, the day after reporting the incident to her, that it did not really happen.

¶ 12    A.S. agreed that, especially in 2021 and 2022, her mom and defendant drank and fought frequently. She agreed that their home "[w]as not a fun place to live." In 2022, when she was "like 11 or 12," A.S. told A.G. what defendant did when she was eight; A.S. had first told her "friend." A.S. testified that she has lived with Alicia since the incident and they have discussed it. Also, A.S. and Alicia have discussed A.S.'s testimony given at prior hearings, and A.S. has discussed her trial testimony with the State.

¶ 13    On redirect examination, the State asked A.S. if she recalled whether the door to her bedroom at the Elgin house had a lock on it. She replied, "I don't think it did." She was also asked how she knew that it was defendant's tongue that touched her vagina. She replied, "[I]t felt wet." She replied, "No," when asked whether she was able to see any part of defendant's face when the pillow was on her head. She saw defendant after the pillow came off when he laid down. Defendant was the only person in the room with her. A.S. lived with defendant from the time she was three until she and Alicia moved out in 2022. A.S. considered defendant to be a "father figure" to her. After telling Alicia what defendant did, she and Alicia moved in with A.S.'s father. Alicia and A.S. lived separately "[f]or like a month or two."

¶ 14                          2. H.T.'s Testimony

¶ 15    H.T. testified that she was 14 years old and that defendant was her uncle. In spring 2022, H.T. was friends with A.S. H.T. identified screenshots of text messages between H.T. and A.S. during that time. In the exchange, A.S. stated: "when I was 8 or 9 my mom when [*sic*] yo [*sic*]

Arizona and Mikey wanted me to sleep in his room in my moms [*sic*] spot and he licked me somewhere and I just told me [*sic*] mom today." She also stated: "I didn't tell my mom cuz [*sic*] I thought I would get in trouble." H.T. testified that the screenshots fairly and accurately depicted her conversation with A.S. H.T. testified that she knew the messages were from A.S. because she "remember[ed] [A.S.] talking to [her] about it later on." H.T. spoke with Velazquez in September 2022. The trial court admitted the screenshots into evidence.

¶ 16   On cross-examination, H.T. testified that she has had "alot [*sic*] of conversations" with A.S. about the incident. When asked if A.S. ever said anything suggesting that "she did not know if it was a dream or not," H.T. replied, "I believe so, yes." H.T. elaborated:

> "Well, I remember asking her like later on, after the first time she told me she wasn't sure if it was a dream, but I remember asking like for clarification later on and she said that she remembers it as being real."

H.T. confirmed that the first time A.S. told her about the incident, A.S. said she did not know if it was a dream, "[b]ut later on, she determined it was real."

¶ 17                                    3. A.G.'s Testimony

¶ 18   A.G. testified that she was 12 years old and that A.S. was her cousin. At the beginning of summer 2022, A.S. told A.G. over the telephone that defendant "touched her vagina." A.S. did not tell A.G. what defendant touched A.S.'s vagina with. A.S. told her it happened in "a bedroom." A.G. spoke with Velazquez on September 26, 2022.

¶ 19   On cross-examination, A.G. testified that she went to A.S.'s house often. From 2018 through 2022, they spoke almost every day. A.G. agreed that A.S. told her that it happened "in her room," which A.G. understood to mean A.S.'s bedroom. A.G. also agreed that A.S. said the incident occurred when she was 11; A.S. did not indicate that it happened four years earlier. The

summer 2022 disclosure was the only time A.S. mentioned what happened; they have not spoken about it since then.

¶ 20                                4. Alicia's Testimony

¶ 21    Alicia testified that she was A.S.'s mother. She began dating defendant in 2012. She lived with defendant at two locations—first at his parents' house in Genoa and then at the house in Elgin. Alicia shared a bedroom with defendant, and A.S. had her own bedroom. Alicia stopped living with defendant on June 20, 2022, after "[A.S.] had approached [her] in the kitchen and just said that she did not feel safe there anymore." Defendant was home asleep in his bedroom at the time. This occurred around 1 a.m. Alicia and A.S. packed their things and left about 30 minutes later. They went to Renee's house, which was about 15 minutes away.

¶ 22    According to Alicia, the next day, while at Renee's house, A.S. told Alicia why she was uncomfortable. Renee was present during the conversation. A.S. told Alicia that, "while [Alicia] was gone, *** she was in [Alicia's] room and *** [defendant] had pulled down her pants and licked her, and then rolled over and went to sleep and she went in her room and locked the door." A.S. told Alicia that defendant had "licked her private parts." A.S. told her that it had gone on for "5 to 10 minutes." While she was telling Alicia what had happened, A.S. "was sad and crying. She was upset." Alicia knew that A.S. was referring to when Alicia was in Arizona for a funeral, because she "remember[ed] getting the phone call from [A.S.] and she was just upset, but she would[n]'t tell me why she was upset." The call took place at night, and Alicia arrived home three or four days later. At the time, A.S. was eight years old. After A.S. told Alicia what had happened, Renee called the police. Ultimately, Alicia took A.S. to the CAC.

¶ 23    According to Alicia, the June 2022 disclosure was not A.S.'s first. About one month before the June 2022 conversation, she and A.S. had another conversation about defendant. A.S. told

Alicia that "she talked to one of her friends on the bus and that she needed to tell [Alicia] something when she got home." Alicia had a conversation with A.S. and afterwards told A.S., " 'Okay, let's pack our things, let's leave.' " When asked what A.S.'s response was, Alicia stated, "She was scared."

¶ 24    Alicia described her relationship with defendant as "okay." She stated that they "didn't fight alot [*sic*], but normal." When they fought, it was both physical and verbal. She did not know if A.S. ever witnessed any physical violence between them. During that time, she was "probably drinking at least a couple days a week." Defendant drank "[n]ot as much as [she] was, maybe one or two." Before A.S.'s statements in June 2022 and about one month prior, she had never expressed to Alicia that she was uncomfortable around defendant. A.S. was around him "[e]very day."

¶ 25    After taking A.S. to Renee's house on June 20, 2022, Alicia "ended up having to move out and move to Joliet." A.S. stayed with "Aunt Nicole." Alicia stayed in Joliet for about a month and then moved back in with defendant "[b]ecause [she] had no other choice." She could not move in with Renee because Renee did not want Alicia living with her, and there was no room for her where A.S. was living.

¶ 26    Finally, defense counsel asked Alicia whether she ever spoke with defendant about what A.S. told her. Her answer, and the ensuing colloquy, were as follows:

> "A[.] I did, yes.
>
> Q[.] And what if anything did he say?
>
> A[.] The first time I approached him with anything he said he never did that. The second time, he said, maybe he did do that, he was a little 'f*** up', was the words that he used.
>
> Q[.] And when he said that he was a little 'f*** up,' what did you take that to mean?

A[.] Uhm—I mean, I took that as the drinking.

Q[.] Okay. And that's when he said that he maybe did do that?

A[.] Yeah, he said maybe he did do that."

¶ 27　On cross-examination, defense counsel asked where Alicia's conversation with defendant had taken place. Alicia testified that she first spoke with defendant in their living room in May 2022, "right after [A.S.] got off the bus and [they] had the conversation." During the May conversation, defendant "said he didn't do it." She had a subsequent conversation with him "through a text message" where he said he may have done it. Counsel asked, "Do you have a copy of that[,]" and she replied, "I do not, no." Alicia did not recall the date of that text conversation but stated that it was "maybe two" weeks before the June 20, 2022, conversation with A.S.

¶ 28　Alicia testified that, when she told A.S. in May 2022, that they were going to move out, A.S. was "sad" and told Alicia that "she didn't want to move out." The next day, A.S. told Alicia that what she had said about defendant was a dream and never happened. Alicia and A.S. stayed at the Elgin house for two more weeks before leaving, and Alicia eventually moved back in with defendant. Up until they left the Elgin house on June 20, 2022, there were times when Alicia was away and A.S. stayed alone with defendant. There were also times when A.S. would lie in bed with Alicia and defendant.

¶ 29　On redirect examination, Alicia testified that her first conversation with A.S. about the incident was in May 2022, after A.S. texted her while coming home from school on the bus. After speaking with A.S., Alicia told her to pack her things and that they were leaving. Alicia did not know where they would go. At the time, Alicia was working for defendant's family as a caretaker for defendant's grandmother. When Alicia told A.S. to pack her things, A.S. was sad and went to her room. Alicia spoke with defendant when he arrived home that day. According to Alicia, "He

denied it." A.S. then told Alicia that it was a dream and never happened. In June 2022, when A.S. again told Alicia what had happened, "[A.S.] was very clear" that it was not a dream.

¶ 30                                            5. Renee's Testimony

¶ 31    Renee testified that Alicia was her daughter. On June 20, 2022, Alicia came to her house with A.S. Renee spoke with A.S. and Alicia in her bedroom. A.S. was "scared, upset." Renee confirmed that, in February 2019, she traveled to Arizona with Alicia for a funeral.

¶ 32                                          6. Velazquez's Testimony

¶ 33    Velazquez testified that she interviewed A.S. on June 21, 2022. The interview was video recorded. She identified (1) a DVD containing the recording of the interview, (2) a transcript of the interview, and (3) a "female anatomical drawing," which was used during the interview. The DVD and transcript were admitted into evidence. The drawing was admitted for demonstrative purposes only. The video was played for the court.

¶ 34    In the video, A.S. told Velazquez that, when she was "[e]ight or nine" years old, Alicia went to a funeral in Arizona. At the time, A.S. lived with Alicia and defendant in a house in Elgin. One evening while Alicia was away, A.S. slept with defendant in Alicia and defendant's bed. A.S. was wearing a "blue *** tank top" and "shorts" that had "like popcorn and *** snacks" on them. She also wore underwear. At some point, A.S. woke up because the blanket came off her leg and she got cold. She then felt "[her] pants *** being pulled down." Her underwear was also pulled down. She continued, "And then it kind of felt like he was like licking down there." When Velazquez asked, "[W]hat makes you say that it felt like he was licking down there?" A.S. responded, "Cause it like, it like felt like it." When Velazquez asked A.S. to describe the experience, A.S. stated that she was "not sure how to describe it" and then stated that "[i]t felt like, kinda like a tongue or something." A.S. clarified that, by "down there," she meant "[v]agina."

When Velazquez asked what defendant's tongue was doing, A.S. replied, "Just like moving around." She said that his tongue was on the "[o]utside" of her vagina. Velazquez showed A.S. a drawing of a naked girl and asked her to circle the vagina, which A.S. did. A.S. also affirmed that she knew that "vaginas have this line" and that defendant's tongue was "[i]nside" the line. A.S. stated that "like 5, like 5 or 10 minutes later [defendant] went back to bed." A.S then "went in [her] room and *** locked the door."

¶ 35    Velazquez asked A.S. whether her eyes were "open, closed or something different when this was all happening." A.S. replied, "My eyes were like kind of open, but like, kind of closed like halfway." Velazquez next asked A.S. if she was "able to see anything." A.S. replied, "No. Cuz [*sic*] there was, there was like a pillow over my face." A.S. told Velazquez that defendant had put a pillow over her face after he pulled down her pants and underwear. When Velazquez asked A.S. if she ever saw defendant's face, A.S. replied, "A little bit like," and, "At the bottom of his face." Velazquez then stated, "Okay. Okay. And you said, um, that it felt like a tongue, it was wet. Did he say anything?" A.S. told Velazquez that defendant did not say anything and no other part of his body touched hers.

¶ 36    A.S. told Velazquez that she had not told anyone about what happened until "a month ago or so." She told (1) her friend, R., on the school bus; (2) Alicia; (3) A.G.; (4) H.T.; and (5) defendant's stepmom, Stephanie, whom A.S. referred to as her "grandma." A.S. never talked to defendant about what happened.

¶ 37    Velazquez testified that, after her interview, she spoke with others who attended the funeral referred to by A.S. and confirmed the date of the funeral with the funeral home in Arizona.

¶ 38    On cross-examination, Velazquez testified that she had spoken with Alicia before interviewing A.S. Alicia told her that, at some point, A.S. told her that what had happened was a

dream. Velazquez agreed that she never asked A.S. if what had happened could have been a dream. Velazquez spoke with R., H.T., and A.G. H.T. told Velazquez that A.S. said that she did not know whether defendant licking her was a dream or not. However, H.T. did not tell Velazquez that A.S. later told her she believed the incident actually happened. A.S. never told Velazquez that she talked with Renee. Velazquez spoke with defendant on October 20, 2022.

¶ 39    Following Velazquez's testimony, the State rested and defendant moved for a directed verdict. The trial court denied the motion.

¶ 40                                    7. Defendant's Testimony

¶ 41    Defendant testified that he was 32 years old. When he started dating Alicia, whom he had met in high school, A.S. was about three years old. Shortly after they started dating, they moved in together. They first lived with defendant's father and later moved to the Elgin house when A.S. was about six or seven years old. Defendant described his relationship with A.S. as like "father-and-daughter." He stated that A.S. "had a real father but didn't have a very good relationship with him." He "did the best [he] could to give her a father figure." A.S. had her own bedroom; there was no lock on the door. Alicia frequently left A.S. home with defendant. It was not uncommon for A.S. to lie in defendant and Alicia's bed if she was having a "bad night or something, just to get asleep." Defendant recalled the time when Alicia went to Arizona for a funeral, and he also recalled a night during her absence when A.S. fell asleep in his bed. He did not recall anything unusual happening while Alicia was gone. He has never touched A.S. with his tongue or otherwise touched her appropriately. On occasions when A.S. fell asleep in his bed, defendant would carry her to her own bed "so that [he] wouldn't wake her in the morning when [he] got up to go to work." He could not recall if he did so when Alicia was in Arizona. After Alicia's Arizona trip, she and A.S. continued to reside with him until 2022. A.S. continued to come into his room when Alicia

was gone if she was having a bad night. While Alicia was gone, defendant did not drink or smoke marijuana. Defendant testified that he believed that Alicia had a drinking problem. Alicia's drinking caused tension in their relationship; they had arguments and fights. The police have been called to their home due to her drunkenness.

¶ 42     Defendant testified that he did not have any conversations with A.S. on June 20, 2022, about what she alleged to have happened. When he woke up on June 21, 2022, A.S. and Alicia were gone. Alicia later told him why they left. Alicia also later moved back in with him for a couple of weeks.

¶ 43     On cross-examination, defendant testified that, while they lived together in the Elgin house, Alicia was "very often inbetween [*sic*] jobs" but occasionally received "food stamps and stuff, help from the government." Defendant provided all of A.S.'s necessities; he was A.S.'s sole provider "[o]ther than [Alicia]." Defendant and Alicia had "[t]ypical" arguments that "went further when alcohol was involved." Alicia drank "almost every other day" and he would "[s]ometimes" drink with her. He believed he told Velazquez during the October 20, 2022, interview that he drank "maybe once a week" or "a few times a week." His preferred drink was whiskey or vodka. A.S. would sometimes sleep with both defendant and Alicia or, when Alicia was gone, just defendant.

¶ 44     Defendant testified that, in May 2022, he learned that A.S. had claimed that he licked her vagina. Alicia and A.S. continued to live with him and did not move out until June 20, 2022. Defendant did not find out why they left until about a week later. When Alicia told him about A.S.'s allegation, he told her that he did not do it. Defendant denied that he later told Alicia that he "could have done it" and that he was "really f*** up then." The following colloquy ensued:

> "Q[.] [(ASSISTANT STATE'S ATTORNEY WILKINSON)]: And again, you spoke with Detective Velazquez on October 20, 2022, right?

A[.] Yes.

Q[.] It was video-and audio-recorded, right?

A[.] Yes.

Q[.] And Detective Velazquez asked you the question,

'Question: Alicia, when I talked to her, Alicia says she confronted you. Okay, and—uhm—and you told her right away.[']

You: 'I don't remember doing that.'

'And then a couple days later, when you were drinking, you told Alicia you might have been really f\*\*\* up and did it. Do you remember that?'

Your response: 'Kind-of.' "

Defendant testified that he did not recall being asked that question and giving that answer during the interview. He also denied drinking at all while Alicia was in Arizona.

¶ 45 Defendant acknowledged his testimony on direct examination that, when A.S. would fall asleep in his bed, he would pick her up and move her to her bedroom because he did not want to wake her when he went to work in the morning. He did not recall whether he took A.S. back to her bedroom when Alicia was in Arizona, but he believed that A.S. was not in his bed the next morning. He disagreed with the State's suggestion that the reason he did not carry A.S. back to her bedroom was because he was not working the next morning. He stated, "No, I would bring her to her bed whether I had to work the next morning or not. It just wasn't really comfortable staying the whole night with her my bed [*sic*], I didn't sleep well." Defendant admitted that, on direct examination, he did not mention that he carried A.S. back to her bedroom because he did not feel comfortable with her spending the entire night in his bed. The State then confronted defendant with each of A.S.'s allegations, and he denied them all. He acknowledged that A.S. left his room

on the night of the alleged incident. Defendant denied that that was the first time A.S. woke up and left his room on her own.

¶ 46    On redirect examination, defendant acknowledged that Velazquez asked if he drank daily and he answered, "I guess." He agreed that his consumption "could be one drink [*sic*] it could be more." He also agreed that sometimes he carried A.S. to her bed and sometimes she went on her own. Defendant testified that, "two to three years prior [to]" May 2022 there was "some type of disclosure" regarding A.S. He explained that "[i]t was originally brought to [his] attention that [A.S.] had a dream of a sexual nature," and "there was conversations with [A.S.] about that." Defendant agreed that he had texted with Alicia, but he denied ever texting her anything suggesting that "[he] may have done this." He never erased his texts with Alicia. Defendant agreed that he told Velazquez that, on one occasion, while carrying A.S. back to her room, he "noticed that she was—had her hand down her pants and was touching herself." He had never disclosed that to anyone.

¶ 47                            8. State's Rebuttal Evidence

¶ 48    After the defense rested, the State presented two excerpts from defendant's video-recorded interview with Velazquez, which were admitted into evidence. (Defense counsel stipulated to foundation and admissibility.) In the first excerpt, from 16:39 to 16:52, Velazquez asked, "When you do drink, about how many drinks would you drink," and defendant responded, "[T]hree or four, I guess." When Velazquez next asked, "Would that be daily," defendant responded, "Yeh, I guess." Although defendant's full answer is difficult to hear because a door slammed when he was answering, defendant seemed to add, "on the days I do drink, yeh."

¶ 49    In the second excerpt, from 28:13 to 28:59, Velazquez asked defendant about Alicia's statement to her that, when Alicia confronted defendant with A.S.'s allegation, defendant "told her

right away 'I don't remember doing that,' " but then "a couple days later when [he] [was] drinking, [he] told Alica" that he " 'might have been really f*** up and did it.' " Velazquez asked, "Do you remember that?" Defendant replied, "Kind of."

¶ 50                                    9. Trial Court's Ruling

¶ 51    On March 5, 2024, the trial court issued its written decision finding defendant guilty of both charged offenses. The court stated:

> "I find A.S. to be credible. Her testimony was clear, logical and corroborated. Although her testimony is somewhat impeached by the late outcry and the 'dream' explanation, her major details were consistent.
>
> I find *** [d]efendant's testimony somewhat corroborative of A.S.'s testimony.
>
> He agrees A.S. at times slept in his bed with him when Alicia was away. He recalls the time when Alicia was in Arizona.
>
> Finally, *** [d]efendant corroborates the testimony of Alicia in his interview with law enforcement saying he 'kind-of' remembered telling Alicia he could have done it.
>
> That statement indicated he believed it was possible."

¶ 52                            B. Posttrial Motion and Sentencing

¶ 53    Defendant filed a "Motion for a New Trial." In it, defendant noted Alicia's testimony that she had a conversation with defendant where he stated that " 'maybe [he] did something when he was intoxicated.' " Defendant further noted that the conversation was "on text, and such texts were never tendered in discovery." Therefore, Alicia's "non-verbatim question and response" regarding what defendant told her was "introduced in error." The remainder of the motion generally

challenged the sufficiency of the evidence. Defendant asked that the court "reconsider its ruling"[1] or, alternatively, grant a new trial.

¶ 54    On September 18, 2024, the trial court denied defendant's motion for a new trial, stating that it had reviewed defendant's motion, the evidence, and its notes from trial and was standing by its decision. Thereafter, following a sentencing hearing, the trial court merged the conviction of aggravated criminal sexual abuse into the conviction of predatory criminal sexual assault of a child. The court imposed the minimum sentence of six years in the Department of Corrections.

¶ 55    This timely appeal followed.

¶ 56                                    II. ANALYSIS

¶ 57                           A. Sufficiency of the Evidence

¶ 58    Defendant contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt. According to defendant, "[t]he State's evidence was vague, uncorroborated by physical evidence, and was marked by discrepancies and inconsistencies." Thus, he argues that reversal is warranted. We disagree.

¶ 59    The relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *People v. Brown*, 2013 IL 114196, ¶ 48. We will not substitute our judgment for that of the trier of fact on issues involving

---

[1]We note that, because defense counsel did not object to Alicia's reference to the text messages, there was no "ruling" on admissibility.

the weight of the evidence or the credibility of the witnesses. *Id.* A defendant's conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Id.*

¶ 60    A defendant is guilty of predatory criminal sexual assault of a child if he

"is 17 years of age or older, and commits an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the [defendant], ***, and:

(1) the victim is under 13 years of age[.]" 720 ILCS 5/11-1.40(a)(1) (West 2018).

¶ 61    Defendant does not argue that the State failed to prove that the incident *as alleged* by A.S. met the statutory elements of each offense. He does not challenge the age element or dispute that the touching A.S. described was a sufficient act of "contact" done "for the purpose of sexual gratification or arousal" of A.S. or defendant. Instead, defendant argues only that there is reasonable doubt as to whether the incident occurred. We confine our analysis to that argument. Defendant argues that there are facts that raise a reasonable doubt as to the credibility of A.S.'s testimony. Defendant points to (1) the "suspiciously long delay" between the incident and A.S.'s reporting of the incident, (2) A.S.'s "immediate[ ]" recantation, (3) A.S.'s behavior toward defendant after the incident, and (4) inconsistencies between A.S.'s statements during her CAC interview and her trial testimony.

¶ 62    This argument is not persuasive. Viewed in the light most favorable to the State, a rational trier of fact could have concluded that the evidence established beyond a reasonable doubt that defendant committed the offense. A.S. clearly and unequivocally testified that defendant touched her vagina with his tongue when she was lying in his bed on a night when Alicia was in Arizona for a family member's funeral. Alicia, H.T., and A.G. each testified that A.S. reported the incident

to them. Velazquez testified that she interviewed A.S. and that A.S. described the incident to her. The trial court was able to observe A.S. both at trial and in the video recording of the CAC interview. It is well established "that the testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009).

¶ 63    We note, too, that defendant conceded that A.S. slept in his bed during the time period at issue. In addition, Alicia testified that defendant said to her that "maybe he did do that, he was a little 'f*** up.' " Defendant argues that this does "not resolve the doubt that was created by the remaining trial evidence because there was no evidence that this statement was made." However, the trial court heard Alicia testify regarding the statement. The court also heard Alicia testify that the statement was made to her via text and that she did not have the text. The court also heard defendant testify that he never made the statement. But the court also saw the video excerpt from defendant's interview with Velazquez where, when confronted with the alleged statement, he stated that he "kind of" remembered making that statement.

¶ 64    Here, the trial court was in a much better position than we are to determine the credibility of the witnesses and the weight to be given to their testimony. The court was well aware of the circumstances surrounding A.S.'s disclosure, her behavior toward defendant following the incident, and any inconsistencies in A.S.'s testimony. Nevertheless, the court chose to believe A.S. over defendant. After thoroughly reviewing the record, we are not prepared to say that this conclusion was unreasonable. See *People v. Mitchell*, 60 Ill. App. 3d 598, 605 (1978) ("Generally, in a bench trial, the trial judge as the trier of fact is in the superior position to determine the credibility and weight to be given the witnesses' testimony[.]"). See *People v. Jackson*, 2020 IL 124112, ¶ 66 (noting that alleged "discrepancies and inconsistencies" in testimony are "issues to

be resolved by *** the trier of fact"); *People v. Velazquez*, 2025 IL App (1st) 230449, ¶ 59, 61 (finding that the significance of the victim's friendships with her cousins—the perpetrator's children—was a basis for rationally inferring why the victim might have delayed reporting, until 2018, abuse that occurred in 2002 and 2007 and that, given the family dynamics and the victim's young age at the time of the abuse, the victim's continued affectionate relationship with the defendant—her uncle—in the years following his abuse did not compel a conclusion that no reasonable person could find him guilty beyond a reasonable doubt); *In re M.G.*, 2024 IL App (1st) 232106, ¶ 29 (recognizing fear, shame, and guilt as motives to remain silent about sexual abuse in families); *People v. Duplessis*, 248 Ill. App. 3d 195, 199-200 (1993) ("In sexual assault cases involving family relationships, the victim's credibility is not lessened if there is no immediate outcry.") We decline to substitute our judgment for that of the trier of fact on questions involving the weight of the evidence, the credibility of the witnesses, or the resolution of conflicting testimony. See *People v. Burton*, 399 Ill. App. 3d 809, 813 (2010).

¶ 65 Defendant's final argument regarding the evidence rests on a statement made by the trial court at the sentencing hearing, which defendant claims "strongly implied" that the court had doubts about what had happened. We disagree. We place the statement in context:

> "I was impressed by the defendant's statement to the [c]ourt. He *** he maintained his innocence, I think, but *** I find it not a problem for a defendant to maintain his innocence in these matters.
>
> The [c]ourt doesn't pretend to have absolute knowledge of everything that occurred, some kind of omnipresent knowledge of all that happens. I'm reacting to the evidence that has been submitted to the [c]ourt at the trial. I don't know—*I don't have any God-like view of exactly what happened here. I don't pretend to have that*. Only thing I can

talk about is was there proof beyond a reasonable doubt admitted at the trial." (Emphases added.)

Defendant relies on the emphasized statement. As the State notes, the comment was made when the guilt phase of the proceeding had concluded and the court was weighing whether to consider, as an aggravating factor in sentencing, that defendant maintained his innocence. The court's point was that, lacking omniscience, it could not be absolutely certain of defendant's guilt and, thus, should not penalize him for maintaining his innocence. However, the court also reaffirmed its responsibility to determine defendant's guilt based on the evidence at trial, and the court did not waiver from *that* guilty finding. Rather, the court unequivocally reaffirmed that there was proof beyond a reasonable doubt *despite* the fact that defendant maintained his innocence.

¶ 66    In sum, as the First District recently recognized, when considering a challenge to the sufficiency of the evidence, "[o]ur task is narrow." *Velasquez*, 2025 IL App (1st) 230449, ¶ 63. Here, viewing the evidence in the light most favorable to the State, we cannot say that the evidence was so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt.

¶ 67                    B. Ineffective Assistance of Counsel

¶ 68    Defendant next contends that, even if we find the evidence sufficient, we should nevertheless grant defendant a new trial because defense counsel was ineffective in "fail[ing] to request discovery sanctions against the State for not disclosing alleged text messages between [defendant] and [Alicia], during which [defendant] allegedly said 'maybe he did do it.' " Defendant argues that counsel's failure to move for sanctions "was both professionally unreasonable and prejudicial." We disagree.

¶ 69    Illinois courts evaluate claims of ineffective assistance of counsel under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting the *Strickland* standard). Under the *Strickland* standard, to prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness and (2) a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. *People v. Torres*, 2024 IL 129289, ¶ 27. The failure to satisfy either prong precludes a finding of ineffective assistance. *Id.*

¶ 70    We view claims of ineffective assistance "not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). To establish deficient performance under the first prong, "the defendant must prove that counsel made errors so serious, and that counsel's performance was so deficient, that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." *People v. Evans*, 186 Ill. 2d 83, 93 (1999). "[T]he defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy." *Id.* Further, we note that "[a] defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or in judgment do not, of themselves, render the representation incompetent." *Fuller,* 205 Ill. 2d at 331. "[T]he fact that another attorney might have pursued a different strategy, or that the strategy chosen by counsel has ultimately proved unsuccessful, does not establish" deficient performance. *Id.* Thus, we begin with the presumption that counsel's actions were supported by sound trial strategy. *People v. Eddmonds*, 143 Ill. 2d 501, 529 (1991).

¶ 71    Here, defendant claims that defense counsel was deficient for failing to request discovery sanctions against the State for not disclosing text messages Alicia testified she exchanged with

defendant in which he said he might have done what A.S. alleged. Defendant directs us to Illinois Supreme Court Rule 412(a)(ii) (eff. Mar. 1, 2001), which provides in pertinent part:

"(a) Except as is otherwise provided in these rules as to matters not subject to disclosure and protective orders, the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

\*\*\*

(ii) any written or recorded statements and the substance of any oral statements made by the accused or by a codefendant, and a list of witnesses to the making and acknowledgment of such statements[.]"

Defendant claims further that, even if the State first learned of the texts at trial, it had a continuing duty to disclose. He cites Illinois Supreme Court Rule 415(b) (eff. Oct. 23, 2020), which provides for a continuing duty to disclose, stating that "[i]f \*\*\* a party discovers additional material or information which is subject to disclosure, he or she shall promptly notify the other party or his or her counsel of the existence of such additional material." According to defendant, had defense counsel moved for sanctions, there is a "substantial probability that the [trial] court would have either excluded that portion of Alicia's testimony, which obviously damaged [defendant's] defense, or granted a continuance for counsel to investigate further." See Ill. S. Ct. R. 415(g)(i) (eff. Oct. 23, 2020) ("If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances.").

¶ 72    In response, the State does not dispute that it must tender discovery in its possession or control, or that it has a continuing duty to disclose. It contends instead that defendant has not established that the information was ever in its possession or control. Further, it argues that defendant cannot establish prejudice because defendant's admissible statement to Velazquez that he "kind of" remembered telling Alicia that he might have done it provided the trier of fact with the same evidence. See Ill. R. Evid. 801(d)(2) (eff. Oct. 15, 2015) (a statement by a party-opponent is not hearsay if it "is offered against a party and is *** the party's own statement"); see also *People v. Aguilar*, 265 Ill. App. 3d 105, 113 (1994).

¶ 73    Given the circumstances, we cannot say that defense counsel's failure to file a motion for discovery sanctions was objectively unreasonable. The State tendered to defendant the video of defendant's interview with Velazquez. In the video, defendant was confronted with the statement that he had allegedly made to Alicia. There is no indication in the recorded interview that this exchange between Alicia and defendant took place via text. Indeed, the first indication in the record that this exchange occurred via text was Alicia's testimony on cross-examination. Alicia testified that she did not have a copy of the texts.

¶ 74    Although defendant's interview with Velazquez did not apprise the State of the texts, defendant argues nonetheless that "[i]t is reasonable to infer that the [State] interviewed [Alicia] and discovered the circumstances of the conversation, including that the conversation took place through text messages." He also argues that the State's failure to learn the circumstances of the conversation established a lack of due diligence that also constituted a discovery violation. See *People v. Cunningham*, 332 Ill. App. 3d 233, 249 (2002) ("The State has a duty to use due diligence to ensure that it becomes aware of discoverable matters and must see that there is a proper flow of information between all the branches and personnel of its law enforcement agencies and legal

- 23 -

officers."). However, this is nothing more than speculation. There is simply no evidence that the State knew that the conversation took place via text message, or that it was less than diligent during any interview of Alicia that may have occurred. In the absence of evidence that the State possessed and failed to disclose information regarding the text messages, it is not likely that a motion for discovery sanctions would have succeeded. See *People v. Steele*, 2014 IL App (1st) 121452, ¶ 41 ("In the absence of evidence that the State had medical reports that it failed to disclose, it is highly unlikely a motion for discovery sanctions would have succeeded[.]").

¶ 75    Indeed, rather than move for sanctions, defense counsel used Alicia's eleventh-hour disclosure of the fact that defendant's statement was made via text to challenge Alicia's credibility as to whether the statement was ever made. Counsel expressly noted the absence of any evidence of the text message in closing. He stated:

> "Now, we've got Alicia who is saying, no, that was in a text message. There was no such text message. She never said it was in a text message. Only time she said it was in a text message was here on the stand. And, obviously, it was not brought out on discovery. She told the CAC that this was a conversation."

It was not objectively unreasonable for counsel to choose to challenge Alicia's credibility in this manner rather than to pursue what would have been a likely frivolous motion. We note too that, as defendant acknowledges, had counsel moved for sanctions, the trial court could have granted a continuance for counsel to investigate the issue. See Ill. S. Ct. R. 415(b), (g)(i) (eff. Oct. 23, 2020). Indeed, "[t]he preferred sanction is a recess or continuance if the granting thereof would be effective to protect the defendant from surprise or prejudice." *People v. Aguilar*, 218 Ill. App. 3d 1, 9-10 (1991). Although a continuance would have allowed defense counsel time to investigate the matter further, an investigation could have confirmed Alicia's testimony about the text.

Counsel's strategy to forgo taking that risk and to instead challenge Alicia's credibility based on her eleventh-hour disclosure of the texts and her failure to produce them was not objectively unreasonable.

¶ 76    Given this conclusion, we need not consider prejudice. We note, however, that defendant makes no challenge to the State's argument that, even if Alicia's testimony was barred as a sanction, defendant's statements to Velazquez admitting that he "[k]ind of" remembered telling Alicia that he " 'might have been really f*** up and did it' " were otherwise admissible and provided the trial court with the same information that was elicited through Alicia's testimony.

¶ 77    Based on the foregoing, we cannot say that defense counsel provided ineffective assistance.

¶ 78                                III. CONCLUSION

¶ 79    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 80    Affirmed.